1823.

JEROME
v.
ROSS.

JEROME and others *against* Ross.

An injunction is not granted to restrain a mere trespass, where the injury is not irreparable and destructive to the plaintiff's estate, but is susceptible of perfect pecuniary compensation, and for which the party may obtain adequate satisfaction, in the ordinary course of law.

It must be a strong and peculiar case of trespass, going to the destruction of the inheritance, or where the mischief is remediless, to entitle the party to the interference of this Court by injunction.

The *Canal Commissioners* being authorized by the act (sess. 44. ch. 78.) to complete the *lock and dam* commenced in the *Hudson* river, between *Waterford* and *Troy*, in order "to connect the *Champlain canal* with sloop navigation," the lock and dam became connected with and part of that canal; and the canal commissioners, therefore, under the act relative to *canals*, (sess. 40. ch. 262.) which authorized the canal commissioners, by their agents, &c. " to enter upon, take possession of, and use any lands, waters and streams, *necessary* for the prosecution of the improvements intended by the act, and to make all such canals, feeders, dykes, locks, dams, and other works and devices, as they may think proper for making said improvements, doing, nevertheless, no unnecessary damage," and the act (sess. 48. ch. 202. s. 3.) which authorizes them to enter upon any lands contiguous to the canals, or the works connected therewith, and to dig for, work, get and carry away, and use, all such stone, gravel, clay, and timber, and other materials, as might be necessary or proper, in their opinion, for the reparation of the canals, or the works connected therewith, doing as little damage thereby, as the nature of the case would permit, may lawfully enter on land near the *Hudson* for the purpose of breaking up stones from a ledge of rocks, in the side of a hill, sixty rods from the river, and which stones were necessary for filling up and completing the lock and dam in the river, by which the *Champlain canal* was to be completed and connected with the sloop navigation; and this court will not grant an injunction to restrain them, or their agents, from so entering on the land of the plaintiff, and breaking up and carrying away the stones, &c.

THIS cause came before the Court, on appeal from an interlocutory decree of the honourable *William A. Duer*, July 28th and 29th.

1823.    Judge of the Circuit Court of the third circuit, under the
        act passed *April* 17, 1823, dividing the state into circuits,
JEROME    and vesting equity powers in the Circuit Judges.(*a*)    The
v.
Ross.

(*a*) This act, (sess. 46. ch. 132.) pursuant to the fifth section of the
fifth article of the new constitution, divided the state into eight cir-
cuits, corresponding in extent with the eight senatorial districts. The
10th section of the act declares, that " the Circuit Judges shall have,
within the limits of their respective circuits, concurrent jurisdiction
with the Chancellor of this state, of all matters and causes in equity,
of every description and character, subject, however, in all cases, to
the appellate jurisdiction of the Chancellor." The 15th section de-
clares, " that it shall and may be lawful to appeal from any final de-
cree of either of the Circuit Judges, to the Chancellor of this state,
saving, however, to the party appealing, and to the appellee, before
the Chancellor, all exceptions taken and reserved in the Court of the
Circuit Judges, to any interlocutory order or decree. And it shall
be lawful for either party to appeal to the Chancellor from any in-
terlocutory decree of any Circuit Judge ; but there shall be no appeal
from any interlocutory decree of any Circuit Judge, before a final de-
cree in the cause, unless such Circuit Judge shall certify that such
interlocutory decree involves the merits of the cause, and that there
may be ground for appealing ; and the Chancellor shall hear and de-
cide such appeal, in a summary manner ; and if, by his decision, fur-
ther proceedings in the same cause shall be necessary, the same shall
be remanded to the Circuit Judge, for such further proceeding ; and
if the cause be remanded, no appeal shall be taken to the Court for the
Trial of Impeachments and the Correction of Errors, from any decree
of the Chancellor, until such further proceedings and a final decree
be had in the cause ; *and further*, that in all appeals from the said
Circuit Judges, or either of them, to the Chancellor, it shall be the
duty of the Circuit Judge, to return to the Chancellor all the proceed-
ings had before him, including the testimony taken, and certified co-
pies of all rules and orders, entered by direction of the said Court so
appealed from ; and that it shall be the duty of the Chancellor to pro-
ceed on such appeal, and pronounce judgment thereon ; and that it
shall and may be lawful for the Chancellor to enforce his decree, in
any cause so brought before him by appeal, and decided by him, in
like manner as if the same had been originally commenced in the
Court of Chancery ; and that the time, form and mode of filing such
appeals, shall be regulated by the Chancellor of this State, subject to
alteration by the Legislature from time to time."

bill filed by *Ross* (appellee) in the court below, against *Jerome* and others, stated, that the plaintiff was seised and possessed of two certain lots of land in *Troy*, and of an undivided fifth part, as tenant in common, of two other lots, &c., on which there is an extensive ledge of stone and mass of rock, &c. That on the 23d of *May* last, and divers times between that time and the filing of the bill, the defendants, without the consent and against the will of the plaintiff, entered upon the said lots, and with cattle, implements, powder, &c. dug up, &c. and removed large parcels of stone, and applied the same for building a dam in the *Hudson* river, near to the north line of the city of *Troy*. That the plaintiff has commenced several actions at law, in a Court of record, to recover damages for the injuries, &c. That he brought a suit before a Justice of the Peace against *J. R. V.* and *N. C.*, two persons employed in digging and carrying away stone, for four or five days, &c.; and a verdict and judgment were given for the plaintiff, on the 28th of *June* last, for 25 dollars, being about half of the value of the stone, &c. That *L.*, one of the defendants, appeared and pleaded for the defendants in that suit, who proved on the trial, that they acted under the direction of the defendants in this suit, or some of them; and that the defendants *K. B.* and *L.*, had entered into a contract to build the dam; and that the defendant, *Jerome*, assumed to act as engineer, and had taken possession of the ledge of rocks, and directed the others to take the stone for building the dam, &c.; and more than twenty teams, and a great number of men, were employed in digging up and carrying away stone, &c. That after the verdict and judgment, to wit, on the 30th of *June* last, the plaintiff found the defendant, *L.*, on the ground, with a great many labourers, taking and removing stone, &c.; and, though prohibited by the plaintiff and the other tenants in common, he refused to desist; and the defendants still continue with their teams and servants to dig, take, and

1823.    carry away the stone, declaring that they will not desist,
nor pay for the stone, &c.    That suits at law are an
JEROME    inadequate remedy for the irreparable injuries of which the
v.
ROSS.    plaintiff complains, in the wrongful taking and destruc-
tion of his property, which cannot be replaced or restored.
That the lots of land, from which the stone is taken, are
not contiguous to the *Hudson* river, but are more than
sixty rods from the bank, between which and the lots
there is a public highway, besides several building lots
intervening.    That the defendants intend to use the stone,
without leave, in completing the dam, for which more than
a thousand loads are requisite; and it would involve the
plaintiff in great peril and trouble, if he should pursue his
legal remedies.    That the defendants pretend, that they
are acting on behalf of the State of *New-York*, and by
authority of the statutes relative to canals, whereas their
acts are wholly unauthorized.    *Prayer*, for an injunction,
&c., and for general relief.

*July* 15th.    The injunction was allowed.

The defendants, in their answer, admitted the seisin of
the plaintiff, and of the other tenants in common, as
charged in the bill.    They stated, that, on the 3d of *May*
last, eight persons (named) entered into a contract with
*Samuel Young*, one of the Canal Commissioners, to com-
plete the lock and dam on the *Hudson River*, &c.    That
it was expressly understood between the contractors and
the Canal Commissioners, that the materials for filling in
the dam should be furnished to the contractors from the
rocky hill near the dam, and from which materials for that
purpose had been previously obtained, without objection
on the part of the owners, under the direction of the en-
gineer, and by virtue of several statutes; and it was co-
venanted by the contractors, that the lock and dam should
be completed, in a permanent and substantial manner, by

the 1st day of *October* next. That, on the 20th of *May* last, the contractors entered into a sub-contract with the defendants, *L. B.* and *R. K.*, for the completion of the dam, &c., under the direction of the engineer, by the 1st day of *September* next. That the erection and construc-tion of the dam are absolutely necessary for the completion of the *Champlain canal*, inasmuch as part of the canal, adopted by the Canal Commissioners, can be supplied with the necessary quantity of water in no other way; and the Commissioners have taken the possession and control of the dam, and the lock connected with it, upon the terms and under the provisions of the act of the Legis-lature, entitled, " An act respecting the navigation of the *Hudson river* between *Troy* and *Waterford*," passed *March* 9, 1821 ; and the works mentioned, are an essen-tial part of the Canal. That the defendant, *Jerome*, by the appointment of the Canal Commissioners, is, and from the 1st of *May*, 1823, has been, the principal engineer on the *Champlain canal*, and in the employment of the Canal Commissioners ; and as such engineer, and by the au-thority of the statutes, &c., he entered upon, and located a sufficient quantity of a certain rocky hill near the dam, for the purpose of getting good and substantial materials, &c., to be used in the erection and completion of the dam, and directed the defendants, the sub-contractors, to enter upon, break up, and take away the rock for these purposes ; and which location was seen and approved of by *S. Y.*, the acting Canal Commissioner on the *Cham-plain canal*. The defendants admitted the entry on the plaintiff's land, and the digging, &c., without any other license than that received from the public agents. That the stones have been taken along the foot of the east side of the hill, for about ten rods in length, and penetrating into the side of the hill about thirty feet; and that the foot of the hill crosses the lots of the plaintiff, &c. They admitted the suit and judgment stated in the bill; but,

1823.

JEROME
v.
ROSS.

**1823.**

**JEROME**
**v.**
**ROSS.**

being advised that the judgment was erroneous, they had brought a *certiorari* to reverse it. They alleged, that the stone and rock broken up and taken away are of no use, except for some such purpose as that to which they have been applied; and are of no use for buildings or enclosures; and that the injury to the plaintiff is merely nominal. They admitted that they told the plaintiff that they would not pay for the stone : That it will take above 5000 loads of stone to complete the work, and there was nearly a sufficient quantity broken up and lying on the premises, for the completion of the dam, &c., and that the expense of breaking them up had been above 800 dollars. That if the work should be delayed until a freshet in the river, before the timber curbs which had been sunk, were filled in, the work would be endangered, and the canal could not be completed this season, to the great damage of the contractors, and serious detriment of the public, as the free use of the canal depends on the completion of the work. They admitted that the injury, if any, was irreparable, because the stones could not be restored to their former place; but they denied that the rocks, in the situation in which they were, being broken up, were of any great value; and alleged that the laws have provided sufficient means of compensation, without troublesome litigation. They admitted the location of the rock and premises, as stated in the bill, &c.

A motion was made, on the 21st of *July*, on the coming in of the answer, in the Court below, to dissolve the injunction, on two grounds : 1. Because the injury to the plaintiff was not irreparable ; and, 2. Because the matter set up in the answer was no justification.

The Judge of the circuit stated at large his reasons for refusing to grant the motion, and which are contained in the following opinion, delivered by him, and transmitted, with his certificate, and copies of the proceedings, &c., before him, to the Chancellor.

*Opinion.*  The motion to dissolve the injunction in
this case, rests upon two grounds :

1st. The want of equity in the bill ; and

2d. Upon the matter of justification set up in the an-
swer.

1. The grounds laid for the injunction in the bill are,
that the defendants are committing irreparable waste, with-
out any pretence of title or right to the occupation of the
soil ; and that the plaintiff has no adequate remedy at
law, without bringing a multiplicity of suits ; or, at all
events, that the mischief may be completely effected before
their termination.    Since the disuse of the common law ac-
tions of waste and estrepement, the more easy and complete
mode of proceeding by bill in equity, to *stay* waste, either
threatened, or which the party is in the act of committing,
and for *an account* of such as may have already been done,
has been particularly favoured by the Courts, both in *Eng-
land* and in this country.   And it is laid down, by the
present Chancellor, in one of the earliest cases before him,
(*Kane* v. *Vandenburgh,* 1 *Johns. Ch. Rep.* 12.) " that it
is a wholesome jurisdiction, to be liberally exercised in the
prevention of irreparable injury, and depends on much
latitude of discretion in the Court."

The Courts in *England* were, however, for a long time,
extremely strict in confining the relief in equity to cases of
tenancy, founding their interference in restraint of waste on
the privity of title between the parties.   The first instance
of relaxation, was in a case where an injunction was grant-
ed, upon a forcible entry, against the commissioners of a
turnpike for digging gravel on land of the plaintiff ;
but this seems to have been grounded on the equity of
*quieting possession* merely. (*Hughes* v. *Merton College,* 1
*Ves.* 188.) The rigour of the ancient rule was at length
further relaxed, upon the avowed principle of enjoining in
matters of *trespass, where irreparable injury is the conse-
quence ;* and upon the authority of this case, Lord *Eldon*

1823.

JEROME
v.
ROSS.

granted an injunction to restrain a trespasser from digging coal upon the premises of another. (*Mitchell* v. *Dors*, 6 *Ves.* 147.)

Where the title comes in question, the Court, nevertheless, requires a strong case of destruction to be made out against trespassers—a case of irreparable mischief, which may be completely effected before any trial can be had as to the controverted right. (*Eden on Injunction*, 139. 7 *Ves.* 308. 1 *Johns. Ch. Rep.* 318.) But where the plaintiff's title is not controverted, it is considered as established, that a Court of equity will always interpose to restrain irreparable mischief. (*Eden on Injunction*, 140.)

Had the right of the plaintiff in this case to the premises appeared doubtful from the bill, or had the bill disclosed an adverse *claim* to the land, I should have refused the injunction, unless it had been alleged, that the injury would have been complete before the right could have been settled at law; in which case I should have directed notice of the application to have been given, before ordering the writ. But I consider the bill as presenting a clear case of irreparable injury, without pretence or claim of title to the premises ; a case, in which it is evident, from the nature of the injury, that the remedy at law must be inadequate, not merely from the necessity of resorting to a multiplicity of suits, but from the ineffectual nature of those suits in preventing a continuance or repetition of the injury. Nor am I now induced, from the argument, to think that the matter of the bill is not such as to warrant the exercise of the jurisdiction of this Court, in granting the injunction.

2. It remains, therefore, to consider, whether, upon the justification set up in the answer, the writ ought to be dissolved or modified. The answer admits the entry of the defendants upon the premises, without the consent of the plaintiff; the digging, breaking, and carrying away of the stone ; and the irreparable nature of the injury ;

but denies the stone to be of any great value. Hence it has been argued by the counsel for the plaintiff, upon the authority of *Allen* v. *Crobroft*, (*Barnard. Ch. Rep.* 373.) that inasmuch as the defendants admit the equity of the bill, and set up new matter of defence on which they rely, the injunction ought to be continued to the hearing. But the rule, I apprehend, cannot apply to a case of this kind, in which the substantial merits are to be decided upon this motion; and, in a matter so much in the discretion of the Court as the dissolving or continuing of an injunction, I should certainly not feel myself bound, in the present instance, to retain it, if I were not satisfied that the matter relied on by the defendants is, in itself, insufficient. They claim to have rightfully entered upon the premises in question, and to have taken the stone therefrom, by direction of the Canal Commissioners, or their agents, under the authority of the several acts of the Legislature relative to the *Erie* and *Champlain canals;* they allege, that the dam in the *Hudson* river, to the construction of which the materials have been applied, is absolutely necessary for the completion of the *Champlain canal*, upon the plan adopted by the commissioners, and aver that they are the most suitable and convenient materials for the purpose intended, and that they may be taken with less injury to the owner than any upon the same side of the river.

Their right to take them, therefore, depends upon the true construction of the acts referred to ; and although the defendants specify no one of those acts in particular, nor any definite part or portion of any of them, yet it is abundantly evident from the answer, (and was indeed admitted by one of the counsel, on the argument,) that they mean to rely on the 3d section of the act of *April* 15, 1817. (sess. 40. c. 262.) This section enacts, " that it shall and may be lawful for the said Canal Commissioners, and each of them by themselves, and by any and every superin-

1823.

JEROME
v.
Ross.

tendant, agent, and engineer employed by them, to enter upon, take possession of, and use all and singular any lands, waters, and streams, necessary for the prosecution of the improvements intended by this act." Now, whether the dam in question be an improvement intended by this act, I do not mean to decide; for although points have been raised and debated by the plaintiff's counsel, with respect to the distinct nature of the powers vested in the Canal Commissioners, in relation to the dam, and to the omission of the Legislature to extend, as in other cases, the specific powers conferred by the clause above cited, to that particular work, by an express re-enactment; yet from the view I have taken of the case, it will be unnecessary for me to consider them. If it shall appear, as I conceive it will, that the statute referred to affords no warrant for the acts set forth in the bill, and admitted by the answer, it would be useless to discuss the other questions which have been made: for if all other grounds were conceded to the defendants, they would, nevertheless, fail on that on which they place their ultimate reliance.

The question then is, whether, according to the true construction of the act of 1817, any other power was intended to be conferred on the commissioners, than that of taking such lands, &c. for the canal improvements, as may be *necessary* to be permanently appropriated and occupied as the site and tract of the canals, and of the works connected with them, which, according to the provisions of the same section of the act, are to be taken and paid for upon appraisement, and the fee simple vested in the State.

The defendants contend, that much more than this was meant by the Legislature, and that the commissioners have authority, under the act, to enter upon any land not immediately contiguous to the canals, or to the works connected with them, without any design of permanent appropriation and acquisition of the fee; but for the mere purpose of carrying away such materials as they may deem most

*suitable* for their purpose, and most *convenient*, though not absolutely *necessary* to be there taken.

To support this position, they refer to the opinion delivered by his honour the Chancellor, in the case of *Rogers* v. *Bradshaw*, (20 *Johns. Rep.* 735.) decided in the Court of Errors, in *February* last; but a careful examination of that case has convinced me, that there is nothing in it to sustain the doctrine thus attempted to be deduced from it. In that case, the plaintiff in error, who was defendant in the Court below, was sued in an action of trespass for entering upon the land of the defendant in error, and cutting and despoiling timber growing thereon. The defendant below justified under the several acts relative to the canals, and it was shown in proof, that a turnpike road, adjoining the place where the trespass was alleged to have been committed, was unavoidably encroached upon by the track or course of the canal, and that another road was indispensable at that place, and must have been made before that part of the canal was commenced; that the land on which the entry was made, was a necessary, if not the only course for a road; that it was staked out under the direction of the chief engineer; and that the defendant, under the authority of the Canal Commissioners, and in pursuance of a contract with one of them, was putting the ground in the form of a turnpike, when the action was brought.

Upon these facts, his honour the Chancellor held, in opposition to the judgment of the Supreme Court, (20 *Johns. Rep.* 103.) that the plaintiff in error was justified by the act of *April*, 1817, and also by an act passed in *April*, 1820, (sess. 43. c. 202.) declaring, " that in all cases, in which it should be deemed necessary by the principal engineer, in laying out the line of the canals, or any work connected therewith, to discontinue or alter any part of the public road or highway, on account of its interfering with a proper location or construction of either of the canals, the engineer shall be authorized to make such discontinu-

1823.

JEROME
v.
ROSS.

ance or alteration, provided that the Canal Commissioners, before they obstruct the passage or any part of a highway now legally established, shall open, and reasonably work, in order to render it passable, such part of the said highway, as may be new laid out by the engineer."

As no other member of the Court of Errors assigned reasons for his opinion, it is impossible to determine to what extent the provisions of the last mentioned statute may have operated in producing the unanimous judgment which was rendered in that case. His honour the Chancellor, however, considered the conduct of the plaintiff in error, equally defensible under the act of 1817. I not only bow to the authority, but assent to the reasoning of that opinion. I merely deny its application to the case before me; for the grounds on which his honour rests his decision, are, that the land taken in that case was *necessary* for the prosecution of the improvement intended by the act; that it was permanently appropriated to that object; and that the fee became vested in the State. He argues, most conclusively, that if the plaintiff had no power, under the act of 1817, to make such a substituted road, on the neighbouring ground, in place of the turnpike taken for the canal, they could not go on with their work. The line of the canal must have been either diverted from its course, perhaps with great and lasting inconvenience, or else its progress must have been suspended until new powers had been conferred by the Legislature; and he repudiates a construction leading to such inconvenience and absurdity. He presumes, that the land over which the turnpike road led before it was taken for the canal, had been paid for, under the act establishing the road; and as the act of 1817 provides, that when lands were taken, as being necessary for the prosecution of the improvements, the fee should vest in the State, he supposed that the State, upon paying the party for his land, held the fee of the newly made road, subject to the easement or right of the turnpike corpora-

tion ; and thus only does he harmonize and adjust every conflicting interest in that case, under a just and fair operation of the act of 1817.

1823.

JEROME
v.
ROSS.

But in the case at bar, the rights of the parties are not thus to be reconciled. It is not pretended that the land of the plaintiff, or even the materials taken from it, are *necessary* for the canal improvements, or that it adjoins, or interrupts, or interferes, either directly or indirectly, with the course of the canal, or of a work connected with it ; or that it is a proper site for any such improvement, or work ; or that it is intended that the land itself should be permanently appropriated to the use of the canal, and the fee simple paid for and vested in the State. On the contrary, it is admitted that it is the material it affords, and not the land itself, that is wanted ; and in regard to the material, it is merely alleged, that it is more *suitable* and convenient than any other upon the same side of the river, across which the dam is to be extended. It is admitted, too, that the premises are sixty rods distant from the bank of the river, on the other side of a public highway, with several buildings and tiers of lots between them, and that nothing more than the mere damage sustained by the plaintiff from breaking up and carrying off the stone, is to be appraised and paid for.

If the words of the statute warrant the taking of the stone under these circumstances, I can imagine no possible limit to the authority or discretion of the commissioners. If they have power to take from land, not appropriated as necessary to the prosecution of their works, materials which they conceive *suitable* in their nature, and *convenient* in point of situation, at the distance of 60 rods, I see nothing to prevent their taking from the lands and enclosures of individuals, any other materials they may fancy, in any situation, or at any distance. Such a construction, therefore, is unreasonable and dangerous ; and, if

1823.

JEROME
v.
ROSS.

adopted, would give sanction to a stretch of power never contemplated by the act.

I readily admit that statutes, vesting an undefined discretion in public agents, to enable them to effect a great and beneficial object, ought to be benignly and liberally expounded in favour of those agents, if acting in good faith, and within the scope of their authority. But I am, nevertheless, bound to restrain them, whenever from mistake they exceed that authority; and, on all occasions, to protect the rights of individuals from the encroachments of power. The characters of the Canal Commissioners forbid the supposition of any intentional abuse of their authority; and the property in this case may be of little or no value to the owner; but as this motion must be decided on principle, those circumstances can have no weight or bearing. Their agents may abuse their confidence, and wrest their power to the purposes of their private interest; and they, as well as persons exercising similar powers under other statutes, for less meritorious objects, may invade property of greater value; but the rule which governed in the one case, would, nevertheless, be applicable to the other. This rule, therefore, must be general, and is, as I conceive, well established, by the cases which declare, that all powers granted by statute, and especially those authorizing an interference with the right of private property, must be strictly pursued. Nor, from these cases, can there be any greater doubt of the power of Courts of equity, to interfere in relation to the proceedings of persons acting under a statute, than in cases of trespass by private individuals. The Court of Chancery of this State, has interfered to restrain inspectors under the act for draining swamps and bog meadows, in the counties of *Orange* and *Dutchess*, (sess. 27. ch. 91.) and enjoined them perpetually in a case in which they had exceeded their powers. (*Belknap* v. *Belknap*, 2 *Johns. Ch. Rep.* 463.) And, in *England*, the instances of such

interference are numerous, and the cases more directly in point. They are, moreover, recognized by the Chancellor in the authority last cited from *Johnson*. In the case of *Shand* v. *The Aberdeen Canal Company*, (2 *Dow*, 519.) Lord *Eldon* said, that if the Canal Commissioners exceeded their power, they became trespassers; but Chancery would restrain them by injunction, and keep them strictly within the limits of their power. The case of *Agar* v. *The Regent's Canal Company*, (*Cooper's Eq. Rep.* 77.) shows, as his honour the Chancellor observes, in *Belknap* v. *Belknap*, " that the jurisdiction on this subject is well settled, and in constant exercise ; and that the cases maintain the most steady uniformity in their doctrine and relief."

It was contended, however, by the defendants' counsel, on the argument, that the injunction granted in the case should, at all events, be so modified, as to permit the taking away the materials already severed from the freehold ; as in cases of waste committed upon timber, where, subsequently to its being cut down, it has been suffered to remain on the land ; but those are all cases of tenancy, in which the party, committing the waste, was in possession of the premises. (5 *Johns. Ch. Rep.* 170.) To permit an entry in this case, for the purpose suggested, would, in effect, be to authorise a repetition of the trespass. As there are no facts to be settled, except the quantiy and value of the materials, which may be ascertained upon a reference, the whole controversy turns on the construction of the act of *April*, 1817, and from the opinion which I entertain upon that question, I must deny the present motion, and order the injunction to be retained.

The cause was set down for a hearing, before the Chancellor, on the petition of appeal, and copies of proceedings, &c., transmitted by the Circuit Judge, on notice for the purpose to the appellants.

*July 28th.*

1823.
JEROME
v.
ROSS.

*Veile*, for the appellants. He cited 7 *Vesey*, 310. 17 *Vesey*, 110. 2 *Vesey*, jun. 415. 452. 2 *Atk.* 483. 2 *Johns. Ch. Rep.* 463. 3 *Johns. Ch. Rep.* 602. 1 *Vesey*, jun. 188. 5 *Johns. Ch. Rep.* 21. 1 *Vern.* 127. *Eden on Injunctions*, 112. 20 *Johns. Rep.* 735.

*Mitchell*, *Buel* and *Cushman*, contra. They cited 2 *Johns. Ch. Rep.* 463. 1 *Johns. Ch. Rep.* 318. 9 *Johns. Rep.* 512. 2 *Dow's Rep.* 519. *Cooper's Rep.* 77. 19 *Johns. Rep.* 259. 4 *Johns. Ch. Rep.* 497. *Eden on Injunctions*, 107. 113. 139. 140. *Laws of New-York*, sess. 40. ch. 196.

*July 29th.* THE CHANCELLOR. This is the case of an appeal from an interlocutory decree of the Circuit Judge, for the third circuit, sitting in equity, pronounced on the 21st of *July* instant, and by which decree, the injunction, allowed on the 15th instant, is continued until the hearing. The reasons assigned in the order, for the continuance of the injunction, are, that the injury complained of in the bill is irreparable in its nature, and the matter set up in the answer insufficient for the justification of the defendants.

Under the 15th section of the judicial act of the last session, (sess. 46. ch. 182.) an appeal lies from an interlocutory decree of a Circuit Judge, provided the Judge certifies that such decree involves the merits of the cause, and that there may be ground for appealing. The requisite certificate was given in this case; and as the Chancellor is directed, by the act, " to hear and decide such appeal in a summary manner," I allowed the cause to be set down forthwith for hearing, upon what was deemed reasonable notice to the parties, under the circumstances of the case.

The order, continuing the injunction, overruled the two grounds, taken in support of the motion for dissolving the injunction, and which were,

1. The want of equity in the bill.

2. The sufficiency of the justification set up in the answer.

1823.

JEROME
v.
ROSS.

1. I have not been able to satisfy myself that the bill contains sufficient equity to warrant the injunction.

The bill contains a charge of trespass, by entering upon the land of the plaintiff, and digging, throwing up, and carrying away, large parcels of stone, from a ledge of stone and mass of rock on the premises. Several actions have been commenced in a Court of record to recover damages for this trespass; but it is not stated that any of these actions have been brought to trial. One action has likewise been instituted before a justice of the peace, and that action has been tried, and the plaintiff recovered damages to the amount of 25 dollars. The plaintiff has his complete and perfect remedy at law for the trespass, as often as it may be repeated; and the only question is, whether the injury be so ruinous and irreparable as to call for the extraordinary interposition of a Court of equity. The bill does not pretend that the ledge of rock, upon which the trespass was committed, was of any particular use or value to the plaintiff, or that he ever did or ever intended to apply it to any valuable purpose. The plaintiff speaks of the injury as irreparable, because the loads of stone, taken from the mass of rock, cannot be replaced or restored; but as he does not state that the rock was of any use to him, as proper or fit for building, fencing, &c., or that it was even desirable as an object of ornament or taste, there was no need of having the same identical fragments of stone replaced, and the injury was not, in the sense of the law, irreparable. It was susceptible of a perfect pecuniary compensation. The case, therefore, seems to resolve itself into this single point, whether a Court of equity ought to interpose, by injunction, to restrain a trespass, when the injury does not appear to be irremediable and destructive to the estate, and when the ordinary legal remedy in the Courts of law can afford adequate satisfaction.

1823.

JEROME
v.
Ross.

The *English* Court of Chancery is now in the habit of granting injunctions in trespass, when the case is peculiar and special; and even this practice came into use long subsequent to the date of our revolution. As late as 1786, (*Mogg* v. *Mogg*, *Dickens*, 670.) Lord *Thurlow* directed a search to be made, to see if ever there was an instance of an injunction, where a mere trespasser entered upon land and cut timber; and as no such precedent could be found, he denied it even in a case of trespass in cutting down timber. But since that time, the practice has been introduced, and justly and reasonably applied to special cases, where irreparable ruin would have followed the refusal to injoin the trespass. It was allowed by Lord *Thurlow*, in *Fleming's* case, (cited 6 *Vesey*, 147.) where the defendant had worked from his own land into the coal mine of the plaintiff; and that case was followed by Lord *Eldon*, (6 *Vesey*, 147. 7 *Ves.* 307.) on the principle that irreparable mischief and ruin of the property, *as a mine*, would be the consequence, if the party was not stopped. On the same ground, the injunction is granted against diverting a water course from a mill; (1 *Bro.* 588.) against the destruction of timber; (10 *Vesey*, 290.) against the taking of stones of a peculiar value; (17 *Vesey*, 128.) or stones from a quarry. (18 *Vesey*, 184.) But all these are cases of great and irremediable mischief, which damages could not compensate, because the mischief reaches to the very substance and value of the estate, and goes to the destruction of it in the character in which it is enjoyed. The present case is, in no reasonable sense, analogous to those cases. The plaintiff does not aver, or show, that the "ledge of stone and mass of rock," on which the trespass is committed, is of any essential use, or that he does or can apply it to any valuable purpose. It is very possible that this "ledge of rock" may be some precipitous, naked, barren hill, absolutely worthless for any other purpose than that to which the defendants apply it. Is the case, then, to be compared to that of a lead

or coal mine, or a quarry of marble, or a fine building, or precious stone, or a grove of timber, or a mill establishment, which the Court of Chancery has thought proper to protect from trespass and ruin, by the strong and menacing hand of an injunction? Certainly not; and if the plaintiff is entitled to an injunction in this case, I do not see why every man, in possession of land, may not call for an injunction to protect him from his neighbour's trespasses in every possible case.

The objection to the injunction, in cases of private trespass, except under very special circumstances, is, that it would be productive of public inconvenience, by drawing cases of ordinary trespass within the cognizance of equity, and by calling forth, upon all occasions, its power to punish by attachment, fine and imprisonment, for a further commission of trespass, instead of the more gentle common law remedy by action, and the assessment of damages by a jury. In ordinary cases, this latter remedy has been found amply sufficient for the protection of property ; and I do not think it advisable, upon any principle of justice or policy, to introduce the Chancery remedy as its substitute, except in strong and aggravated instances of trespass, which go to the destruction of the inheritance, or where the mischief is remediless. This was the opinion and doctrine which I had occasion to declare in the case of *Stevens* v. *Beekman*, (1 *Johns. Ch. Rep.* 318.) and it appears to be the *English* doctrine, and the practice of this Court has been in conformity to it. I do not know a case in which an injunction has been granted to restrain a trespasser, *merely because he was a trespasser*, without showing that the property itself was of peculiar value, and could not well admit of due recompense, and would be destroyed by repeated acts of trespass. In ordinary cases, the damages to be assessed by a jury will be adequate for a check and for a recompense. Every man is undoubtedly entitled to be protected in the possession and enjoyment of his pro-

perty, though it may be of no intrinsic value.    He may have  on his land a large mound of useless stone or sand, which he may not deem worth  the expense of  enclosing, and yet it would  be a  trespass  for any person to remove any portion of the stone or sand without his consent; and he would be entitled to his action, even though the damages were nominal.    But would it be proper for this Court to assume cognizance of such a trespass, and lay the interdict of an injunction upon it ?  I apprehend not.

The bill, to which I am still confining myself, does not, except in a very imperfect manner, disclose the pretences or claim of right under which the trespass has been committed.    It only states, that the defendants are engaged in building a dam in *Hudson's* river,  near the north line of the city of *Troy*, and that the materials taken from the ledge of  rock  are applied  to  the dam ;  that one of the defendants acts as engineer in that operation, and  that the defendants pretend that they are acting on behalf of this State, and by authority of the statutes, relative to canals.    But admitting that the defendants do pretend  to act by public authority in their commission of the trespass,  it does not alter the  principle ;  and the trespass itself  must be of the character I have described, before a Court of equity can be called upon to interfere  by  injunction.    All the cases referred to, were those in which the trespass went to the destruction of the property, as it had been held and enjoyed. In the case of *Agar* v. *The Regent's  Canal  Company*, (*Cooper's  Eq.  Rep.*  77.) the defendants were empowered by a  private act of Parliament to cut a canal ;  the line of the canal had been prescribed, and they departed from that line, and were carrying the canal through a garden and rickyard,  and Lord *Eldon*  allowed an injunction. So in the case of *Shand* v. *Henderson*, (2 *Dow*, 519.) the *Aberdeen Canal Navigation Company* were charged with having taken and appropriated lands to their use, by unwarrantably deviating from the line particularly prescribed by sta-

tute, and an injunction to restrain the Canal Company within their limits, was admitted to be proper. But in both these cases, the companies were making a permanent appropriation of the land, and destroying the inheritance; and upon the acknowledged principle, in all the cases, it was necessary to restrain them. In the case, also, of *Hughes* v. *The Trustees of Merton College*, (1 *Vesey*, 188. and *Belt's Supp.*) the commissioners of a turnpike company entered, took possession of, and were destroying, by digging for gravel, large garden grounds of the plaintiff, who was a gardener by trade. The turnpike act had specially excepted gardens, as well as orchards, planted walks, &c.; and Lord *Hardwicke* thought it a clear case of trespass, and of such a nature, that the plaintiff was entitled to seek his remedy by injunction, though he had his remedy at law. But he admitted, that if there had been any ground for doubt, whether or not the commissioners had authority, he would not have interposed until the doubt had been removed, and the matter finally determined at law. And it is to be observed, that here was the destruction of what a man was using *as his trade or livelihood*.

Several cases have occurred in this Court, in which public trustees have been restrained by injunction from acts of trespass, but the acts were such as went to destroy the enjoyment of valuable property and privileges.

Thus, in the case of *Gardner* v. *The Trustees of Newburgh*, (2 *Johns. Ch. Rep.* 162.) the trustees were going to divert a stream of water that had flowed immemorially, and had supplied the brickyard, the distillery, and mill erections of the plaintiff; and the case not being deemed within the provisions of the act in favour of those trustees, an injunction was granted. Afterwards, in *Belknap* v. *Belknap*, (2 *Johns. Ch. Rep.* 463.) an injunction was allowed upon the same principle, of preventing a great and irreparable mischief. In that case, inspectors under an act of the Legislature for draining certain swamps

1823.

JEROME
v.
ROSS.

and bog meadows, for the benefit of some individuals, undertook to lower a large pond of 400 acres, by cutting down the outlet, which would destroy the value of the pond and outlet as a source of water for the use of mills established on the outlet. It was considered to be an interference not warranted by the statute, and to be a great and special trespass, leading to lasting mischief, and the destruction of the estate. It was further observed, that it was not a case which concerned the public, but one of mere private convenience and profit, and the act ought to be strictly construed.

These cases all show, that, in respect to acts of trespass committed upon land, even by persons in a public trust, under colour of law, the Court has not interfered by injunction, unless where the trespass was permanent, as well as grievous, or went to destroy the value of the property to the owner. It is not sufficient that the act be simply, *per se*, a trespass; but it must be a case of mischief and of irreparable ruin to the property, in the character in which it has been enjoyed. In all other cases, the common law remedy is deemed to be adequate, and perfectly competent to give compensation, as well as to deter and prevent the repetition of the trespass, by the exemplary damages which it will inflict.

A Court of equity will sometimes interfere, to prevent a multiplicity of suits, by a bill of peace. The principle is stated in *Lord Tenham* v. *Herbert*, (2 *Atk.* 483.) and in *Eldridge* v. *Hill & Murray*. (2 *Johns. Ch. Rep.* 281.) But that is only in cases where the right is controverted by numerous persons, each standing on his own pretensions; and it has no application to the case of one or more persons choosing to persevere in acts of trespass, in despite of suits and recoveries against them. A troublesome man may vex and harass his neighbour, by throwing down his fences, and turning cattle upon his grounds, or by passing over them, or otherwise annoying him; but it is to be presumed,

that repeated recoveries for damages, with the punishment of costs, and such smart money as a jury would naturally give, would soon effectually correct any such disposition. At any rate, I do not know that a Court of equity has ever interfered merely to correct such a practice; and it would certainly require very strong evidence of the inefficacy of the ordinary legal remedies for compensation, as well as for correction, before this Court would venture to assume a jurisdiction hitherto unknown.

For these reasons, I am of opinion, that the bill itself does not contain matter sufficient to warrant or sustain the injunction; and that the plaintiff ought to have been left to his remedy at law.

2. But, admitting that the injunction was warranted by the bill, the next question is, whether the answer does not contain a sufficient justification.

It appears by the answer, that the defendants are employed by the Canal Commissioners to complete a lock and dam in the *Hudson river*, and that the work is carrying on under the direction of one of the defendants, who is the principal engineer employed on the *Champlain canal;* and that by an agreement between the persons engaged to build the dam, and one of the Canal Commissioners, the materials for filling the dam were to be furnished from the rocky hill near the dam, and from which materials for that purpose had been previously taken without objection. It further appears, that the erection and construction of the dam is absolutely necessary for the completion of the *Champlain canal,* because a part of the canal, upon the plan adopted by the Canal Commissioners, cannot be supplied with the necessary quantity of water in any other way; that the Commissioners have taken the possession and control of the dam, and the lock connected with it, upon the terms, and under the provision of the act, entitled, " an act respecting the navigation of *Hudson's river* between *Troy and Waterford;*" and that these works

are an essential part of the canal. It further appears, that the defendant, *Jerome*, the principal engineer, and in the employment of the Canal Commissioners, entered upon, and located a sufficient quantity of the rocky hill near the dam, for the purpose of procuring good and substantial materials for filling in the timber cribs in the dam, and the location was seen and approved of by the acting Canal Commissioner on the *Champlain canal;* that the stone have been taken along the foot of the hill, penetrating its steep side for about thirty feet; that the stone and rock broken up and taken away, are useless for building or fencing; and that there is sufficient, or nearly sufficient, stone already broken up upon the premises to complete the dam, the expense of breaking up of which cost upwards of 800 dollars; that the rock is not above 60 rods from the river, and it furnishes the most suitable and convenient materials, and can be taken with less injury to the owners than any other upon that side of the river. They admit the recovery before the Justice, but they insist upon their authority under the statute to take the stone, and that the recovery is erroneous; and they have already brought a *certiorari* for the purpose of having the judgment reversed.

After the opinion which has been expressed upon the first point, it is not necessary, for the present disposition of the case, to give any decided opinion on the validity of the matter alluded to in the bill, and expressly set up in the answer by way of justification. It might, perhaps, be as well to avoid it altogether, inasmuch as the justification under the canal acts is a legal question, and which appears from the pleadings, to be pending at law. But as this second point was discussed and passed upon by the Court below, and as it has been raised and discussed before me, without objection, and is involved in the decree appealed from, and as the essential facts leading to that justification are founded on statute powers, and are not

controverted, it cannot be improper to take it into consi-
deration; and it would be required, if I am to pass in re-
view the whole merits of the decree.

The Canal Commissioners, in the erection of the lock
and dam in question, have the same powers that are con-
ferred upon them in respect to the *Champlain canal.* By
the act referred to in the answer, (sess. 44. c. 78.) the
Canal Commissioners were authorized to complete the lock
and dam, " in order to connect the *Champlain canal* with
sloop navigation," if they should deem it advisable, and
should signify in writing their intention to do the same.
The answer avers that they have done so. It becomes,
therefore, essentially part and parcel of the *Champlain
canal,* and the real property appropriated for the site of
the lock and its appendages, vests in the people of this
State, on the completion of the lock and dam, and the
Canal Commissioners are authorized to establish and col-
lect tolls at the lock.

Assuming, then, as a clear and plain proposition, that
the Canal Commissioners are vested with the same powers
in the erection of this dam, as in the construction of works
on any part of the line of the canals, they had a right to
take possession of, and use the ledge of rock in question,
for the construction of the dam. The 3d section of the
act of the 15th of *April,* 1817, " respecting navigable
communications between the great western and northern
lakes and the *Atlantic* ocean," (sess. 40. c. 262.) declared,
that it should be " lawful for the Canal Commissioners,
and each of them, by themselves, and by any and every
superintendant, agent, and engineer, employed by them,
to enter upon, take possession of, and use, all and singular
any lands, waters and streams, necessary for the prosecu-
tion of the improvements intended by this act; and to
make all such canals, feeders, dykes, locks, dams, and
other works and devices, as they may think proper for
making said improvements, doing, nevertheless, no unne-
cessary damage."

The case before us falls precisely within the words of this provision. The Commissioners, and those under them, may *enter upon and use any lands necessary for the prosecution of the improvements intended by the act.* The dam in question being connected with the *Champlain canal,* is an improvement within the meaning of the act. What lands are necessary to be entered upon, and used, must rest in the judgment of the Commissioners, and all that can be required is, that they act with good faith, and with sound discretion. The word "*necessary*" does nòt mean absolute and indispensable, or that without the use of the land, in the given case, the work could not possibly go on. That would be the same as extreme necessity. The Legislature used the word in a more reasonable and popular sense. It is sufficient that the land used, and the materials taken from it, are needful, and conducive to the object, and more convenient in the application, and less valuable, and the use of them less injurious to the owner, than any that might readily be selected. There must, from the reason of the thing, and the nature of the case, be great latitude of discretion in the selection of the land and the materials; and, in the present case, it is perfectly apparent, that the Canal Commissioner located the ground from which the materials for filling in the dam were to be taken, with judgment, and according to the spirit and letter of the act. He did take care, as the act required, to do *no unnecessary damage.* The materials must have been taken from some adjoining land, and from whence could they have been taken with more discretion?

I cannot perceive any room for doubt, as to the power of the Commissioners to *enter upon and use* the ledge of rock in question, for the purpose of making the dam. There is nò avoiding this conclusion, unless we can maintain the construction, that the act only intended that the Commissioners 'might enter', use, and take possession of land, for *permanent appropriation* of the whole fee of the

land, and not for temporary use. According to this con-struction, if they wanted room adjoining the canal, for a temporary deposit of materials for locks and dams, or a right of way or passage to the canal, or the materials of stone, gravel, clay, &c. from the adjoining lands, they could not use them, without at the same time appropriating the fee of the land. But why should the Commissioners be obliged to appropriate a greater interest in the adjoining land than is requisite for the public object; and what possible objection can there be to the construction, allowing them to make as much use of the adjoining grounds as should be necessary for the prosecution of the improvements, *and no more?* The precaution enjoined upon them, to do *no unnecessary damage,* seems to imply, that they were authorized to make a temporary use of the lands. The act of 1816 authorized the Commissioners to explore and examine the lands contiguous to the probable course of the canal, and to cause surveys and levels to be taken. This necessarily implied a right of entry upon lands for these purposes. The act of 1820 (sess. 43. c. 202. s. 3.) also authorized them to enter upon any lands contiguous to the canals, or the works connected therewith, " and to dig for, work, get, and carry away, and use, all such stone, gravel, clay, timber, and other materials, as might be necessary or proper, in their opinion, for *the reparation of the canals,* or the works connected therewith, doing as little damage thereby as the nature of the case would permit." The Commissioners would then be authorized to take the stone from the ledge of rock in question, to repair this dam in the *Hudson;* and can it be reasonably supposed, that the Legislature did not intend they should have this power for the necessary construction of the dam in the first instance? The public utility is as much concerned in the exercise of the one power as of the other, and these several canal acts constitute a distinct code of statute law, and are to be taken and construed together, as being made

1823.

JEROME
v.
ROSS.

in furtherance of one great, useful, and splendid public object, and which, in the language of the Legislature, in their act of 1817, will " promote agriculture, manufactures, and commerce, mitigate the calamities of war, and enhance the blessings of peace, consolidate the union, and advance the prosperity and elevate the character of the *United States.*" Statutes made for the public good, and for general and beneficent national purposes, are to receive a very liberal construction, and to be expounded in such a manner, as that they may, as far as possible, attain the end. The rule is, that they are to be so construed, as not to advance a private and destroy the public interest, but always to advance the public interest, doing as little damage as possible to the private interest. (11 *Co.* 73. *b.* *Str.* 253. 2 *Vern.* 431.) So, it is a general rule of interpretation, that a greater will include a less interest; and a provision, as to more objects than one, includes a provision for one of those objects.

I have no doubt, therefore, that under the general authority to *enter upon and use any lands necessary for the prosecution of the improvements, doing no unnecessary damage,* the commissioners, and the defendants, by their authority, might lawfully enter upon and use the ledge of rock in question for the building of the dam; and that a contrary construction is not only against the words, but is too narrow and too rigid for the liberal spirit and enlarged policy of the act, and the immense pressure of the public interest. If there was ever a case in the ordinary pacific operations of government, in which all petty private interests should be made subservient to the interest of an entire people, this is one. The canals were undertaken " in full confidence that the Congress of the *United States,* and the States equally interested with this State in the commencement, prosecution, and completion of these important works, would contribute their full proportion of the expense." We have not, as yet, realized the fruits

of that confidence, and we are left to bear singly the whole expense, as well as to enjoy all the honour and glory of this stupendous undertaking. We have advanced too far to recede. The whole entire plan must and will be completed. All little impediments must be surmounted; and the powers of the Commissioners must be taken to be, as they were certainly intended to be, commensurate with the duties to be performed. In the language which I had occasion to use at the last session of the Court of Errors, in *Rogers* v. *Bradshaw*, and, as I presume, with the entire approbation of the Senate, " we must take expressions in the most extensive sense, when it is probable the lawgiver had in view every thing pointed out by that extensive sense, and when we give to the expressions the sense most suitable to the subject, and best adapted to the facility and success of a great and generous scheme of public policy."

There is an additional provision in the 3d section of the act of 1817, which declares, " that in case any lands, waters, or streams, taken and appropriated for any of the purposes aforesaid, shall not be given or granted to the people of this State," it shall be the duty of the Canal Commissioners to cause the loss and damage, if any, over and above the benefit and advantage to the owner, to be certified in the way pointed out, and the damages to be paid, and the fee simple of the premises so appropriated, shall vest in the people of this State."

This provision applies only to lands taken *and appropriated*, and which, I should rather think, means lands permanently applied, so as to be entirely lost to the owner, and not lands affording a temporary use for passage and deposit, or for procuring materials for the locks, dams, &c. But there is no sufficient reason to consider this latter part of the section as qualifying and controlling the general powers given in the former part of it. The general power is, to *enter upon and use all lands necessary for the prosecu-*

tion of the improvements, and to make canals, feeders, locks, dams, &c. doing, nevertheless, no unnecessary damage; and then comes the provision, that any lands taken *and appropriated* for any of the purposes aforesaid, shall be paid for and vest in the State. There was no need that the fee of lands used only for a temporary purpose, should be vested in the public. If the owner is paid for the damage occasioned by the temporary use of his lands, it is all that he can justly require, and this compensation the State is bound to give him. If the act we are examining has omitted to make any provision for the assessment and payment of damages for such temporary use, it may have escaped the attention of the Legislature, or the case may have been deemed, at the time, immaterial and unimportant. The omission, however, if it be one, does not prevent the right of the commissioners to enter and use the land; nor prevent the just claim of the owner upon the commissioners or the Legislature for his reasonable compensation. The commissioners are not trespassers, when the act authorizes them to enter, if they enter before the damages are paid for. This was so understood and declared, in *Rogers* v. *Bradshaw*, already referred to. The claim for compensation arises after the use has been had; and the damages cannot well be assessed before they have arisen. Whatever, therefore, may be the better construction as to the mode of ascertaining and enforcing the compensation, it does not affect the right of the commissioners to enter, nor justify the interference of a Court of equity to interdict their entry.

It is probable the Legislature considered that the Canal Commissioners had sufficient discretionary power to pay for all damages arising from the temporary use of lands, upon which they might enter for the prosecution of the improvements, and the appropriation of materials, which they might derive from such use. Their discretion, in the expenditure of the canal moneys, is very large. They are

" to cause the same to be expended in the most prudent and economical manner, in all such works as may be proper to make the canals." And as they are to do no unnecessary damage, it was doubtless intended that all *necessary damage* should be paid for by them. The only difficulty in the case is, how to assess the damages when the parties cannot agree. If the lands are *appropriated* permanently by the transfer of the fee, or if materials are taken from adjoining lands for *reparations* of injuries to the canals, or the works connected therewith, the statute points out a specific mode of assessment. As all these canal statutes are to be taken and construed together, as being made *in pari materia*, the damages resulting from a temporary use of the land, fall within the equity of these provisions; and the Commissioners would be justified in adopting one of them, or the owner might, perhaps, by application to the Supreme Court, or to a Court of equity, enforce an assessment and payment, in the mode provided for in other cases.

But the question of compensation is distinct from the right of entry to take and use the land necessary for the purpose of the improvements; and that right I hold to be unquestionable, provided it be not abused in the exercise, through the want of good faith or due discretion. If the Commissioners enter to procure necessary materials, and they keep within the limits of a reasonable discretion, and do no unnecessary damage, they come within the range of the strong powers conferred upon them, and their entry is justified by the statute.

I am of opinion, therefore, on this second point, as well as on the other, that the injunction ought to be dissolved.

The case is interesting in every point of view; and I have examined it with all the care and diligence that the closing period of my office would permit. I regretted that the case pressed upon me at so late a moment; and I regret still more, that I should be obliged, in the very last act of my judicial life, to overrule one of the earliest decisions in

equity of one of my junior brethren, for whom I entertain a sincere respect, and to whom I look forward with confident expectation, for an administration of justice, pure and intelligent.

I shall order that the interlocutory decree appealed from be reversed; that the injunction, issued by the Circuit Court, be dissolved; and that the cause be remanded, to the end that such further proceedings may be had upon the bill filed in the Court below as shall be just.

Order accordingly.

---

*July 31st.* This day the CHANCELLOR terminated his judicial labours, having heard and decided every case and motion brought before him.

By the 9th article of the new Constitution of the State, the commissions of all persons holding civil offices were to expire on the last day of *December*, 1822 ; but the officers, then in commission, were to continue to hold their offices until new appointments were made. No new commission having been issued, the CHANCELLOR remained in office, until the 31st of *July,* when, having attained the age of sixty years, the period limited by the Constitution, (art. v. sec. 3.) for the tenure of the offices of Chancellor and Judges of the Supreme Court,(a) his judicial functions ceased.

(a) This very singular limitation, introduced into the first Constitution of the State, in 1777, was inserted, it is understood, to prevent a recurrence of the inconvenience which had been experienced in the case of the individual who last held the office of Chief Justice under the colonial government. Mr. *Hamilton,* in 1788, (Federalist, No. 79.) speaking of this clause of the Constitution, said, that there were few, at that time, who did not disapprove of