The opinion of the Court was delivered by
Dunkin, Ch.
The concluding remarks of the Chancellor are founded on a misapprehension of the facts. When the bill was filed and an injunction granted by the Commissioner, no proceedings were pending, or had been instituted, at law, for the appointment of Commissioners to assess the value of the premises, etc., as prescribed by the Act. By the sixteenth clause of the Act for the incorporation of the Wilmington and Manchester Railroad Company it is declared that, where the parties cannot agree upon the value, lands may be taken, for the purposes designated by the Act, at a valuation to be fixed by Commissioners appointed by the Court of Common Pleas. If an appeal is made from the valuation, it is further provided, that the pendency of the appeal “shall not prevent the works intended to be constructed from proceeding;” and provision is therein made for t.he payment'of the valuation. Before striking a spade into the plaintiff’s land it was, therefore, obviously’ the duty of the Company, in any view of their rights, to have adopted the preliminary measures of having the value of the land, proposed to be taken, assessed by an application to the Court of Common Pleas for the appointment of Commissioners. *51 This would, probably have presented the inquiry as to their right under the charter. It is abundantly shown by Chancellor Kent, in Gardner vs. Newburgh, 2 Johns. Ch. 162, that, until compensation has been paid, or provision has been made for securing compensation to the proprietor of the land, “ it would be unjust, and contrary to the first principles of government, and equally contrary to the intention of the statute, to take from the plaintiff his undoubted right.” On this ground alone he granted an injunction. And if, in this case, the facts had been fully disclosed at the hearing the bill would not have been dismissed.
But it is proposed now to consider the authority of the defendants under the Act of 1846. The Chancellor in his decree expresses his impression that the Statute, which constitutes the charter of the defendants, “does not authorize the improvement designed by the Company and does not bind the private property of the plaintiff for such purpose.” Upon examining the clause of the charter it is manifest that power is given to the Company for two distinct purposes; jFirst, they are authorized to lay out the line of the railroad, and, for this purpose, to pass through the lands of individuals, provided that the lands so laid out on the line of the _ railroad shall not exceed (except at deep cuts and fillings) one hundred and twenty feet in width. Second, they are authorized “ to lay out such contiguous lands as they may desire to occupy, as sites for depots, toll-houses, ware-houses, engine-sheds, work-shops, water-stations and other buildings, for the necessary accommodation of their servants and agents, their horses, mules and other cattle, and for the protection of property entrusted to their care, provided that the adjoining land for the sites of buildings (unless the President and Directors of the Company can agree with the owner or owners for the purchase of the same) shall not exceed five acres in any one parcel.”
The object of the enactment seems sufficiently transparent. The hundred and twenty feet in width allowed for the. track of *52 the Railroad might not be more than sufficient for that purpose. The Company must have also depots, toll-houses, engine-houses, ware-houses, &c., &c., for which purpose they would be obliged to encroach on the adjoining lands beyond the one hundred and twenty feet of width. Perhaps they might desire to establish, at the same point, a depot, toll-house, work-shops, wai-e-houses, &c. They were therefore empowered by the Legislature to lay out such contiguous lands for these objects, provided they did not take of the adjoining land more than five acres in any one parcel. No species of property is held by individuals with more tenacity — none is guarded by the constitution and laws more sedulously — than the right to the freehold or inheritance. When the Legislature interferes with this right, and for great public purposes appropriates the estate of an individual without his consent, the plain meaning of the Act should not be enlarged by doubtful interpretation. This case cannot be well understood without the chart of the proposed improvement which makes part of the brief. But the Railroad spans the Great Pee Dee, and, on the western side, strikes the land of Gibson. Some four hundred yards west of the river, and beyond Gibson’s land, the line of the road passes the land of the plaintiff. It happens that his tract extends in a north-east direction until it strikes the Pee Dee river some four hundred yards north of the Railroad bridge which crosses the river. The defendants propose to construct a tramroad, or some other narrow railway, extending from the Railroad where it strikes the plaintiff’s land and run it in a north-east direction, until it strikes the river, and there to erect a ware-house for the convenience of receiving cotton, &c., from the river boats. As the tramroad will be narrow, and not much space will be occupied by the ware-house, it is estimated that, altogether, not more than five acres of the plaintiff’s land will be taken. We concur with the Chancellor that the Act does not warrant the proceedings of the defendants in thus appropriating the plaintiff’s land. The proposed site of the ware-house is up the river nearly one- *53 third of a mile distant from the Railroad bridge. The distance of the proposed site by the tramroad would be still further from the Railroad. The intention of the Act was only to authorize the Company to extend the width given for the line so as to enable them to erect thereon depots, toll-houses, ware-houses, &c. If Darlington village had been two miles north of the Railroad it might be very convenient for the Company to locate ware-houses, &c., at that point. If the plaintiff had been so unfortunate as to own the intermediate land, could the defendants run a narrow road through his land, against his will, and fix their ware-house or depot at the village, under the clause of their charter allowing them to lay out the lands adjoining the railroad for the site of their depot, warehouse, &c. ? If Mr. Gibson had owned a narrow strip of land fifty feet in width between the Railroad and plaintiff’s land, it is not pretended they could run the proposed road and’fix their site on plaintiff’s land at the river. Doubtless it may be very convenient for the defendants to have this particular site for a ware-house to receive cotton from river boats and for other purposes. It may be very inconvenient and expensive to erect one at a different point. If so, it must be procured in the ordinary mode adopted when a man desires to possess his neighbour’s land. If this site be necessary for the transaction of the business of the road, or a great public convenience, and the plaintiff is obstinate in resisting such improvement, resort may be had to the same power which granted the charter, and the same may be amended as has been recently done in analogous cases.
The next inquiry presented is whether, under these circumstances, the plaintiff was entitled to the injunction granted by the Commissioner. It is not doubted that for ordinary cases of mere trespass the party has an adequate and more appropriate remedy at law, and it would not be advisable (says an eminent jurist) to introduce the Chancery remedy as a substitute except in instances of trespass which go to the destruction of the inheritance, or where the mischief is remediless. In a *54 recent approved treatise on Equity jurisdiction it is said to be “now settled that an injunction will lie for protection of a title admitted or proved at law whenever the act complained of is attended with permanent results, destroying or materially altering the estate.” The strongest authority cited on behalf of the defendants was Chancellor Kent’s judgment in Jerome vs. Ross, 7 Johns. Ch. 336, the last act (it may be observed) of his judicial life, and not unworthy of his fame. One of the grounds on which the Chancellor dissolved the injunction was that the act of the defendants (in removing some stone and gravel from the land of the plaintiff) was a mere trespass. But in the same judgment he cites with approbation the case of Agar vs. The Regent's Canal Company, (Coop. Eq. R. 77,) in which the defendants were empowered by a private Act of Parliament to cut a canal; the line of the canal had been prescribed, and they departed from that line, and were carrying the canal through a garden and rick-yard, and Lord Eldon allowed an injunction. Also, the case of Shand vs. Henderson, (2 Dow, 519,) in which the Aberdeen Canal Navigation Company were charged with having taken and appropriated lands to their use, by unwarrantably deviating from the line particularly prescribed by Statute, and an injunction to restrain the Canal Company within their limits was admitted to be proper. “ But in both these cases (says'Chancellor Kent) the Companies were making a permanent appropriation of the land, and destroying the inheritance; and upon the principle acknowledged in all the cases it was necessary to restrain them.” It is not doubted that in this case the defendants are attempting to make a permanent appropriation of the land admitted to belong to the plaintiff, and thereby to destroy the inheritance. In such case, upon acknowledged principles, the plaintiff is entitled to the aid of this Court. A case was decided in December, 1853, by the Appeal Court of Chancery in England, in which the principles of the Court are thus stated by Lord Oranworth, L. J. “We accede,” says he, “ to the general observation that persons, ob *55 taining from the legislature by Acts of Parliament like those now before us, powers to interfere with rights of property, for their own purposes, are bound strictly to adhere to the powers so conceded to them — to do no more than the Legislature has sanctioned, and to proceed only in the mode which the Legislature has pointed out.” “In such case a plaintiff seeking the assistance of a Court of Equity, by way of injunction, is bound t.o show that he has an interest in preventing the defendants from doing what is in fact, or may well be called, a violation of their contract with the Legislature. He must show not only that the defendants are committing or intended to commit a wrong, but also that the wrong complained of, does occasion, or will occasion loss or damage to him.” The injunction as to part of the bill was made perpetual; and as to another part was dissolved, because the plaintiffs showed no interest in the lands. The case is The Mayor, &c., of Liverpool vs. The Chorley Water Works Company, and is reported 21 Vol. Eng. L. & Eq. R. 624. It is principally instructive as showing the strict sense in which such extraordinary powers granted to corporations should be construed. It might be suggested that public improvements may be sometimes greatly retarded by this summary interference on the part of the Court. But if the right of property in the plaintiff be conceded or established, and the license or warrant of the defendant to encroach upon it is deemed doubtful by a judicial magistrate, the defendant should withhold his hand until the right be established, and it was so held in Darick vs. The Corporation of New York, 4 John. Ch. 53. The power of this Court can rarely be exercised with more salutary effect than in protecting the rights of the humble citizen against the strong arm of a powerful corporation.
The plaintiff also seeks compensation for the injury sustained by the unlawful acts of the. defendants. It is stated by Mr. Justice Story, 2 Eq. Juris., § 794, that, “as a general proposition, for breaches of contract, and other wrongs and injuries, *56 cognizable at law, Courts of Equity do not entertain jurisdiction, to give redress by way of compensation or damages, where these constitute the sole objects of the bill.” “Compensation or damages (it should seem) ought,” therefore, (says he) ordinarily “to be decreed in Equity only as incidental to other relief” sought by the bill and granted by the Court. It does not ordinarily attach except as ancillary to some other relief. “ The mode by which such compensation or damages is ascertained in such cases, is either by a reference to the Master, or by directing an issue quantum damnifieatus, which is tried by a jury. The latter,” he says, “was almost the invariable course in former times, in all cases where the compensation was not extremely clear, as to its elements and amount; and is still commonly resorted to in cases of a complicated nature. But the same inquiries may be had before a Master; and, in cases where such inquiries do not involve much complexity of facts or amounts, this course is often now adopted.” 2 Eq. Jur., § 795. In Watson vs. Hunter, 5 John. Ch. 169, Chancellor Kent says, that in cases of waste it is the practice of the Court to grant injunctions to prevent or stay the future commission of.waste; and the remedy for waste already committed is merely incidental to the jurisdiction in the other case, assumed to prevent multiplicity of suits, and to save the party the necessity of resorting to trover at law. And he cites the authority of Lord Hardwicke in Jesus College vs. Bloom, (3 Atk. 262.) It was there stated that “where the bill was for an injunction to prevent waste, and for waste already committed, the Court, to prevent a double suit, would award an injunction to prevent future waste, and decree an account and satisfaction for what was past. The ground for coming into Chancery was to stay waste, and not for satisfaction for the damages, as the commission of waste was a tort, and the remedy lay at law. But to prevent multiplicity of suits, the Court on bills for injunctions to stay waste, and where waste had already been committed, would make a complete decree and give the injured party a *57 satisfaction for what had been done, and not put him to another action at' law.” The same doctrine was held by Lord Hardwicke in Garth vs. Colton, (1 Ves. 528.)
The principal doubt entertained by the Court is that suggested by the Master of the Rolls in Nelson vs. Bridges, 2 Beav. 239. It is a case of damages and not of account. Ho profits have been made by the defendants, and the object is to ascertain the amount of loss which the plaintiff has sustained by their wrongful acts. In that case after much consideration he ordered an issue quantum damnifieatus — and, in some points of view, this would be the most satisfactory course here —but the plaintiff by applying to this Court, waives all claim for vindictive damages; and the actual injury and loss sustained may probably be as well ascertained before the'Commissioner;, as by subjecting the parties to the delay and expense of a trial at law. It is therefore ordered and decreed that the decree of the Circuit Court be reformed — that the injunction granted by the Commissioner be made perpetual — and that it be referred to the Commissioner to ascertain, and report upon the loss and injúry sustained by the plaintiff in consequence of the unauthorized acts of the defendants.
Johnston and WaRDLaw, CO., concurred.
DaRQ-an, Ch., having an interest, did not sit.

Decree reformed.