## Case No. 981.

BARING et al. v. ERDMAN et al.

[14 Hag. Reg. Pa. 129; Amer. Sent. Aug. 23, 1834.]

Circuit Court, E. D. Pennsylvania. Aug. 4, 1834.

INJUNCTION—TAKING PROPERTY WITHOUT AUTHORITY OF LAW.

[1. An entry upon lands for the purpose of diverting a stream which flows thereon is, if done without right, such a trespass as may be restrained by the decree of a court of equity.]

[2. Equity has jurisdiction to restrain such entry and diversion, though the persons making it be the agents of the board of canal commissioners of the state, if such agents have not authority of law to do the acts complained of. If they act without authority from the state, they are mere trespassers.]

[3. In construing the Pennsylvania statutes of 1825 to 1830 in relation to the construction of state roads and canals, the court must consider them as forming a connected series of legislation to effect an object of great public utility, and they must receive a liberal interpretation.]

[4. In construing the statutes, the court will consider the object of the enactments, and will not suffer it to be defeated, but will make them answer the intention which the legislature had in view, as collected from the cause or necessity of the statutes, though the construction seem contrary to the letter.]

[See Ogden v. Strong, Case No. 10,460; Hadden v. Collector, 5 Wall. (72 U. S.) 107.]

[5. The history and situation of the country will be recurred to, to ascertain the reason as well as the meaning of a statute, to enable the court to apply the rules of construction.]

[6. Although none of the Pennsylvania statutes of 1825 to 1830 on the subject of state railroads and canals contain any express provision authorizing the appropriation by the state of the property of the individuals on their sites, or the taking of materials for their construction, yet, in view of the facts that the state has expended on these improvements $20,000,000, that they extend through the most populous and highly cultivated portions of the state, and that the ground on which they are located, and the materials for their construction, are owned by individuals, without the appropriation of whose property the object must necessarily be defeated, such authority must be implied as necessary to effectuate the object of the statutes.]

[7. A bill in equity was filed which alleged that the plaintiffs were owners of certain lands; that the respondents, agents of the board of canal commissioners of Pennsylvania, entered upon said lands, diverted a stream of water thereon by constructing a dam across it, and dug a trench to carry off the diverted waters for the use of the engines on the inclined railway on the bank of the Schuylkill; and that such acts were done without authority of law,—and prayed for an injunction. The canal commissioners had authority to construct and repair the railway, and to take materials from the adjoining lands for that purpose, but the railway had been completed without a permanent appropriation of the water. Held, that the diversion could not be justified under the authority

to construct and repair; nor could the diverted water be considered a material, within the meaning of the statute.]

[8. The word "material," in a statute authorizing the taking of materials from neighboring lands for the construction and repair of a railroad, refers to those things which are component parts of the road, and necessary for its completion in all its parts, and does not include the means or facilities of transportation upon it afterwards.]

[9. It did not appear from any of the laws prior to 1834 that it was any part of the original scheme of the Pennsylvania state system of canals and railroads to furnish engines for the purpose of transportation. In 1834 authority was conferred on the board of canal commissioners "to procure such locomotive engines or tenders for the use of passengers and merchandise as may be necessary for doing the whole or any part of the transportation," (Laws Pa. 1834, p. 508;) and by another act of the same session a heavy punishment was prescribed for breaking, cutting down, or destroying, in whole or in part, any water station, drain, or bank belonging to any railroad constructed by the state, or stopping up or obstructing any culvert, drain, pipe, water station, or well belonging thereto, (Laws Pa. 1834, p. 202.) Held, that these laws afforded evidence that the legislature regarded water stations, wells, etc., for the supply of the engines belonging to the railroad, as a part of its appendages, and that, in view of the doubt raised thereby, a preliminary injunction restraining the diversion of water for the supply of the engines as without authority of law would not be granted on a motion on the pleadings and affidavits.]

[10. Authority to take materials or divert water for the use of a railroad from lands contiguous to, adjoining, or near the railroad is not limited to the lands next to, and bounding upon, the railroad, but extends to lands in a reasonable vicinity, which must depend upon local circumstances.]

[11. "Near," in such a statute, does not necessarily mean next to, but a reasonable vicinity; and what that is must depend on local circumstances.]

[12. On motion for a preliminary injunction to restrain the taking of the water it was contended that the taking of the water was not necessary, inasmuch as there was a sufficient supply of water on the tract of land through which the railroad passed, and affidavits in support of this view were filed. Counter affidavits were filed by the defendants, of apparently equal weight, to show that the diversion of the water was necessary. Held, that the affidavits raised an issue of fact which should not be determined by the court on the motion; that the necessity of diverting the water was, to some extent at least, within the discretion of the commissioners; and that, in the absence of anything to show an abuse of discretion, the court could not interfere therewith.]

[13. The acts complained of were begun May 19th, and the complainants had notice thereof on May 22d. On May 28th an attempt was made by him, with the assistance of a peace officer and some others, to take possession of the land, and expel the respondents and their workmen, but without success. The complainants notified the respondents not to proceed with the work, but took no further means to prevent its progress till the filing of the bill, on June 25th. In the mean time the dam was built to the height of eight or ten feet, a trench dug across the complainants' land, and the water of the stream conducted to a reservoir on adjoining land, whence it was conveyed through pipes to the engine house. The only act remaining to be done on the premises was the laying of pipes in the trench and filling it up. Held, that

the acts complained of had practically been completed before the filing of the bill, and an injunction could not issue to restrain a completed act; · and that the complainants, by standing by after notice of the commencement of the work until near its completion, when all the substance of the injury had been completed, had forfeited their right to a preliminary injunction.]

[See Webb v. Portland Manuf'g Co., Case No. 17,322; Cole Silver Min. Co. v. Virginia & Gold Hill Water Co., Id. 2,990.]

[14. On a bill to restrain an entry upon land by canal commissioners, on the ground that the entry is illegal and without authority of law, the question whether the entry is illegal because it has been made without compensation does not arise.]

[In equity. Bill for an injunction by Alexander Baring and Ann Baring, in right of the said Ann, and Henry Baring and Maria Baring, in right of the said Maria, all aliens and subjects of the king of the United Kingdom of Great Britain and Ireland, against Frederick Erdman and William Williams, both citizens of the state of Pennsylvania. On motion for an injunction pendente lite. Motion denied.]

This was a bill in equity, praying for an injunction to restrain the respondents from proceeding in the erection of a dam, digging a trench, and diverting and using the water of a stream, on the estate of the complainants, called "Lansdowne," in the immediate neighborhood of Philadelphia. It appeared that the respondents were superintendents and agents under the board of canal commissioners, by whom they were directed to execute the works complained of, in order to supply the locomotive and stationary engines on the inclined plane with the necessary quantity of water. The motion for an injunction was resisted; affidavits on both sides were taken, and the case fully argued.

Jos. R. Ingersoll and Charles Ingersoll, for complainants.

G. M. Dallas, for respondents.

Before BALDWIN, Circuit Justice, and HOPKINSON, District Judge.

BALDWIN, Circuit Justice. The complainants, who are the subjects of the king of Great Britain, having filed their bill on the equity side of this court, setting forth that they are owners of a tract of land, on the western bank of the Schuylkill, of which they have long been in the quiet and peaceable possession, through which a stream of water has run from time immemorial until its diversion by the respondents, by means of a dam, erected across it, on the land of the complainants, and a trench made to conduct it to the Pennsylvania Railroad, for the supply of the engines thereon; that the injury thereby caused is permanent and irreparable, and committed under color of, but without any authority conferred by law on the canal commissioners or any agent or officer appointed by them; they therefore pray for an injunction to restrain the re-

spondents from the commission of any further trespass on the premises, from the further use and diversion of the water of said stream, and the further prosecution of any works, which may in any manner interfere with the full and quiet possession of said land and the water flowing through in its accustomed bed, and general relief. That the title and possession of the premises is and has been for many years in the complainants is admitted; it is also admitted, that the respondents, under the authority and by the direction of the canal commissioners and their engineers, have erected the dam, dug the trench, and conducted the water from and across the premises to the railroad, for the use of the engines employed thereon, for the transportation of passengers and merchandise, up the inclined plane on the western bank of the Schuylkill. From the affidavits on both sides it appears that the work was commenced without notice to the agent or tenant of the complainants, but that as soon as the agent received information, he notified the defendants, not to proceed any further; they, however, persisted, notwithstanding all remonstrances and open opposition, and availing themselves of superior numbers, kept possession of the premises, till they had finished the dam and trench, so as to divert the water to its destination. On these admitted or uncontested facts, various interesting questions have arisen, which have been very fully and ably argued, and deserve our most serious consideration.

If the respondents had invaded the peaceable possession of the complainants, under any pretension of an adversary right, or had diverted the water course for their own individual benefit, by a sheer act of trespass, the nature of the injury would be a proper subject for an injunction. The owner of an estate has a right to use it without any control or interference by others. Whether he makes it the source of profit, pleasure or amusement, his right of property [is] equally protected. No man has a right to judge of the purposes to which the proprietor devotes his time, his capital or his estate, or the relative value and importance of its varied uses. The parks, the pleasure grounds, the shade, ornamental or forest trees, the springs, the water courses or fish ponds, are as much in his full dominion as his mansion house, his grain fields, his meadows or orchards. An immediate injury done to either will be redressed at law or in equity, on the same principles; in a court of law, the remedy depends upon the right of the complainants, and can be afforded only after the injury is committed, but a court of equity interferes to protect a possession held under a claim and color of right, and will prevent an impending or threatened injury, until the party out of possession shall establish his right at law, or otherwise be put into possession by some process which the law recognizes. So far then as the case depends upon the nature of the injury, we should feel it our duty to grant the injunction, if the respondents could be considered as mere trespassers on the possession of the complainants, by any assumed right in themselves, nor would the case be changed if the acts done by them or threatened to be done by them, under the authority of the board of canal commissioners, should appear to be clearly unwarranted by any act of assembly. Though they act as the mere agents of the board or the state, we should be bound to view them as mere trespassers, whom we should enjoin from any future acts, however deeply it might affect the interests of the state. The acts of its agents or officers cannot be permitted to transcend the authority conferred on them by law. They must be clothed with jurisdiction over the subject matter, and with power to do the act complained of, or their proceedings will be controlled by the same rules which restrain private persons from committing irreparable injury to the property of others, [Osborn v. Bank of U. S.,] 9 Wheat. [22 U. S.] 842. By the principles of the common law, confirmed by Magna Charta, and numerous statutes in England, no freeman could be deprived of his freehold but by the judgment of his peers on the law of the land, (1 Bl. Comm. 138,) or as it is expressed by Lord Coke, "verdict of his equals, or legal process, or due process of law," (2 Co. Inst. 45, 46,) due process of the common law, (Id. 50,) or the law of the land. The statutes provide that no man's land shall be seized into the king's hands against the form of the great charter and the law of the land, and if any thing be done against the same, it shall be holden for none. 1 Puff. Law Nat. 209, 263. All the writers on national law lay down the position that private property may be taken for public use, but that this right is subject to the concomitant obligation on the government, to make compensation to the owner. Vatt. Law Nat. 112; Ruth. Inst. 43; Burlam. Nat. 150; Puff. Law Nat. 829, 830; Gro. 333, 334. The ninth section of the ninth article of the constitution of Pennsylvania adopts the provision and language of Magna Charta. The fifth amendment to the constitution of the United States adopts the expression "due process of law;" it also declares that private property shall not be taken for public use without just compensation. The constitution of Pennsylvania is still more explicit: "Nor shall any man's property be taken or applied to public use without the consent of his representatives, and without just compensation being made." It is therefore clear that according to all the fundamental laws of society, the appropriation of private property for public use must be authorized by the law of the land, the judgment of peers, or due process of law, and by compensation to the owner. When such an appropriation is deemed necessary for the

general benefit, the public is considered as an individual treating with another for an exchange; and the legislature may compel the owner to part with his property for a fair price. 1 Bl. Comm. 139, 140. This is ascertained either by the verdict of a jury on a writ of ad quod damnum, or by some other process prescribed by the law, making or authorizing the appropriation. Our inquiry must therefore be directed to the question, whether the state has by law authorized the disseisin of the complainants of any part of their freehold, or the taking or application of their property for public use. It would be a waste of time to examine whether the officers of the state can do it without law or legal process, in direct violation of the constitution and every principle of the common and public law held sacred in all governments, and which cannot be impaired in this without its destruction.

It is a matter of no little surprise to find that none of the acts of assembly of Pennsylvania in relation to the great system of national improvement by roads and canals at the expense of the state, contains any express provisions authorizing the appropriation of the property of the individuals on their sites, or the taking of materials for their construction. This omission is the more singular when we find this authority in all cases explicitly conferred on all corporations created for the construction of bridges, canals, turnpikes, or railroads, and a mode prescribed by which compensation is made to the owners. It cannot be owing to any opinion of the legislature that the constitutional rights of proprietors are less sacred when the state requires their property for the construction of public improvements at its own expense and for its general benefit, than when they are constructed by a company incorporated for that purpose. The whole course of legislation on the subjects of the canals and railroads which are the property of the state, repels an imputation so unworthy of its wisdom and justice.

After the canal commissioners had executed the duties enjoined on them by the act of 1825, the legislature by the act of 1826, (Pamph. Laws, 55,) authorized and directed them to commence the construction of the canal: the eighth section directed them to make agreements with the owners of the land through which it should pass, or if unable to do so, provision was made to summon a jury to ascertain the damages, to value the quantity and duration of the interest and estate which would be taken or injured thereby, also to ascertain the value of materials required for the canal or the works thereof, the dams, locks, feeders or any works appurtenant. By the second section of an act passed at the same time, (page 302,) the commissioners were authorized and directed to take and pay for materials for reparation of the works in the same manner as for materials for constructing such works which may

be removed or taken away. The eighth section of the act of 1827 (page 196) made provision for compensation to any person who might be aggrieved by the canal passing through his land or in any wise interfering with his rights of property; the tenth section authorizes the commissioners to receive releases of damages to land or by the taking of materials. The eighth section of the act of 1828 providing for the commencement of a railroad, directed the commissioners, previous to its final location and putting under contract, to receive releases for the damages to the owners of land by its passing through it or the taking the materials to construct the same. Pamph. Laws, p. 224. The fifth section of the act of 1830 directed them to offer to the owners a reasonable compensation for damages to land or for materials, and if it was not accepted, the governor was by the sixth section authorized to appoint a board for their assessment. Pamph. Laws, p. 220. From these acts it is apparent that, in the opinion of the legislature, the canal commissioners were authorized to locate and construct the canals and railroads on private property, to take up and apply it for public use, as well as all materials necessary for its construction and repair, and that provision had been made for compensation to all persons who might be aggrieved thereby. Such opinion, however, is not of itself sufficient to confer the authority, if it was not given by the former acts; a mistaken opinion of the legislature concerning the law does not make the law, [Postmaster General v. Early,] 12 Wheat. [25 U. S.] 148, and the court is not bound by a legislative misconstruction of a former law, unless it is a positive interpretation of a former act, imposed by the legislature, in subsequent act, (16 East, 333, 334,) or the mistake is manifested in words competent to make the law in future, (4 Taunt. 841.) "If the law expresses the sense of the legislature on the existing law as plainly as a declaratory act, and expresses it in terms capable of conferring jurisdiction, the words ought to receive this construction. If this interpretation of the words should be too free for a judicial tribunal, yet if the legislature has made it, if congress has explained its own meaning too unequivocally to be mistaken, their courts may be justified in adopting that meaning." [Postmaster General v. Early,] 12 Wheat. [25 U. S.] 148–150. In construing these acts of assembly, we must consider them as forming a connected series of legislation, tending to effect an object of infinite public utility, which ought to receive the most liberal and benign interpretation, ut res magis valeat quam pereat,—to make the private yield to the public benefit. Such are the settled rules of construing all statutes made for public benefit in favor of public institutions and all establishments of piety, charity, education and public improvement. 11 Coke, 70–78; Hob. 97, 122, 157; 1 Lev. 55; 3 Dyer, 255; 5 Coke, 14b; 10 Coke,

28a; [Town of Pawlet v. Clark,] 9 Cranch, [13 U. S.] 331; [Inglis v. Trustees of Sailor's Snug Harbour,] 3 Pet. [28 U. S.] 140; [Trustees of Phila. Baptist Ass'n v. Smith, Id.] 481; [City of Cincinnati v. Lessee of White,] 6 Pet. [31 U. S.] 436; 7 Johns. Ch. 340. The court will look to the object in passing the law, and, if it can be discovered in its provisions, will not suffer it to be defeated, but make it answer the intention which the makers had in view. This will be collected from the cause or necessity of making the statute, and will be followed though the construction seem contrary to the letter. A thing which is within the meaning of the makers of a statute, is as much within the statute as if it were within the letter, and a thing which is within the letter but not the intention of the makers is not within the statute. 15 Johns. 380, 381; 14 Mass. 92, 93; [U. S. v. Wiltberger,] 5 Wheat. [18 U. S.] 94; [Postmaster General v. Early,] 12 Wheat. [25 U. S.] 151; [Boyle v. Zacharie,] 6 Pet. [31 U. S.] 644. When the whole context demonstrates a particular intent in the legislature to effect a certain object, some degree of implication may be called in to effect it. [Durousseau v. U. S.] 6 Cranch, [10 U. S.] 314.

The sense of the legislature, as apparent from the whole statute or other statutes passed before or after on the same subject, the general system of legislation in relation to it, must be taken into view, not according to the words of a statute, but its provisions will be extended beyond or restrained within them according to the apparent sense and meaning thus to be collected. 1 Pick. 254, 255. The history and situation of the country will be recurred to, to ascertain the reason as well as the meaning of a provision to enable a court to apply the rule of construction. [Preston v. Browder,] 1 Wheat. [14 U. S.] 121. In doubtful cases, the title or preamble of any act may be referred to, to explain it,—[U. S. v. Palmer,] 3 Wheat. [16 U. S.] 631; 4 Serg. & R. 166; and if by a view of the whole, a clear intention is apparent, such intention is the law. No principle is better settled than that in the constructions of all instruments, the necessary implication resulting from the language used, is equivalent to express words used to express the intention of the parties.

In examining the various laws on the subject of the railroads and canals, on which the state has expended twenty millions of dollars, it is impossible to mistake the object in view, or the intention of the legislature; they extend through the most populous and highly improved portions of the state; the ground on which they are located, and the materials for their construction, are owned by individuals, without the appropriation of whose property the object must be necessarily defeated. It would be unnecessary to go into a detail of the acts in which, during ten successive years, the legislature have authorized the board of canal commissioners to lo-

cate, contract for, construct, complete, and keep in repair the various works constructed under their authority, in order to extract from them evidence of an intention to authorize an entry on private property, and its seizure for all the uses contemplated. We must be judicially blind not to perceive at the first view that such were the object and intention of the law makers, and, being so convinced, are bound to give such exposition to their acts as to effectuate the great object designed —the completion of a great system of internal communication by which the whole country is benefited. The courts are bound to protect the property of individuals from all aggression not authorized by law, and to construe strictly and carefully all laws which authorize any men or body of men to appropriate the property of another to their use, so as to confine them within the jurisdiction and powers conferred. 2 Dow, 521, 534; 1 Burrows, 382; 4 Burrows, 2244; Lofft, 442; Cowp. 26; 3 John. Cas. 108; 7 Durn. & E. [Term R.] 363, 364. Yet this does not require us to overlook the intention, and regard only the letter of the law; this is not the rule in criminal cases, much less in cases in which the interest of the country is involved. [U. S. v. Wiltberger,] 5 Wheat. [18 U. S.] 94, 95. Were this therefore a case in a court of law depending upon strict legal right, we should not entertain a doubt of the general authority of the officers of the state to make the same use of private property for the completion and repair of the canals and railroads as if it were given in express terms; the intent is apparent—the words used are competent to give the power, and in our opinion do give it by necessary implication.

The only subject on which we could entertain a reasonable doubt, is the one which is the immediate cause of the present motion. The diversion of the complainants' water course was not for the purpose of constructing or repairing the railroad, or any of its appurtenant works; they could be and were completed without a permanent appropriation of this water; nor can it be considered as a material, within the meaning of the acts. This word refers to those things which are component parts of the road, necessary for its completion in all its parts, but not to the means or facilities of transportation upon it afterwards.

It does not appear from any of the laws prior to those of April last, that it was any part of their original object to furnish engines for the purpose of transportation. They seem only to have had in view the completion of a railroad, with locomotive or stationary engines. Laws 1827, p. 194. The commissioners had no authority to purchase or procure engines till they were authorized by act of last session. "To procure such locomotive engines or tenders for the use of passengers and merchandise as may be necessary for doing the whole or any part of the transportation." Laws 1834, p. 508. By an act

passed at the same session, a heavy punishment was prescribed for breaking, cutting down, or destroying, in whole or in part, any water station, drain, or bank belonging to any railroad constructed by the state, or stop up or obstruct any culvert, drain, pipe, water station, or well belonging thereto. Page 202. Taking these two laws in connection, it seems to have been the opinion of the legislature that water stations, wells, etc., or the supply of the engines belonging to the railroad as a part of its appendages; they certainly are put on the same footing as to protection or destruction from injury, as the bed of the road. This goes very far to show that it was their intention to authorize their being made, though it may be doubted whether such intention can be so made out as to give the power to enter on private property for this purpose, and make a permanent appropriation of a water course. No provision is made for compensation to the owner in the other cases; nor is there any express direction to construct reservoirs or water stations, or to provide a supply of water for the engines by any other means,—these considerations have their weight on our minds though we are not prepared to decide that there is a want of, or an abuse of authority in doing the acts complained of, we are far from being so clearly of opinion that the law gives the commissioners this power, as that of constructing and repairing the road itself—on a case on the law side of the court it would be our duty to express a decided opinion on this question; so it may be when this case comes up for a final hearing, if the legislature should not in the meantime remove the difficulty; but on a motion for the injunction, we think it not proper to do it.

In the late case of Atkinson v. Philadelphia & T. R. Co., [Case No. 615,] we declared "that if the act complained of is done under color of authority conferred by law, the court will not interfere if there is any ground of doubt as to the authority, until the doubt has been removed, and the matter finally determined at law." Still retaining the same opinion and having the serious doubts as to the authority in this case, we do not feel at liberty to award the injunction on this ground in the present stage of the cause. We are less inclined to do it, as the effect would be to suspend the transportation on this important road; no appeal lies from our present decision; it would not be final, and infinite injury would result, if we should now give an erroneous one. The case must be a plain one to justify such consequences, and a reasonable doubt as to any material point, must be conclusive on a motion.

The counsel of the complainants assume another position, which, if tenable, is an important one,—that admitting the powers of the commissioners to conduct water to the engines; yet it must be done from land contiguous to, adjoining, or near the road, according to the words of the act of 1826, (sec-

tion 8, p. 55,) and other acts making provisions for damages in taking materials. These words must have a reasonable interpretation, according to the subject matter, with reference to the object to be effected, of which the officers, to whom the power of taking materials is confided, must judge according to their discretion. Near does not necessarily mean next to, but a reasonable vicinity. 1 W. Bl. 20. What that is, must depend on local circumstances. That another tract of land separates the railroad from the premises of the complainants is therefore no objection to the exercise of the authority to take materials, or to direct water for the use of the road, if it is necessary for that purpose. On this subject there is great contrariety of opinion between the persons whose affidavits have been taken for our information. On the part of the complainants, it is contended that the diversion of their water course was not requisite, inasmuch as there was a sufficient supply of water upon the tract of land through which the road passes, which could be used with more convenience and at less expense, in which they are supported by the affidavits of very respectable persons, of competent capacity to form a judgment; on the other hand the respondents are sustained in the opposite opinion by the affidavits of persons equally respectable and competent, as far as we know. There is thus an issue of fact between the parties, which we cannot decide on a motion, when there is such a difference between the affirmants, both as to matter of opinion and fact. Should the case ultimately turn on the necessity of diverting the complainants' water course, in order to effect the object of the law, the verdict of a jury ought to be taken on suit brought, or an issue directed; it is not our province (at present, at all events) to judge of the credibility of witnesses, or weigh their respective opinions; it is enough for the purposes of this motion, that the fact is so extremely doubtful as to make it difficult for us to form an opinion on the question of the necessity. By awarding the injunction on the ground assumed by the complainants, we should pronounce a judgment on conflicting evidence: whereas, by referring to an issue, or the final hearing, we should not incur the hazard of doing an irrevocable injury, by a premature order which on more full information, it might be our duty to annul. Besides this is a matter so much of discretion, that we would interfere only in a plain case of abuse or a want of discretion on the part of the public officers, intrusted with the execution of the work. The canal commissioners are a tribunal constituted for this purpose, with power to appoint subordinate officers, who act under their supervision; the law has confided to the board a broad discretion which no other tribunal can assume to itself; while they act within their jurisdiction, and exercise their judgment on the matters confided to them in

good faith, their acts are clothed with the authority of the law, and their judgment is conclusive, unless some mode of revision is provided for by an appeal to some other tribunal. [U. S. v. Arredonds,] 6 Pet. [31 U. S.] 729; [Satterlee v. Matthewson,] 2 Pet. [27 U. S.] 412; 2 Dow. 521; 20 Johns. 740; 7 Johns. Ch. 340; [M'Culloch v. State of Maryland,] 4 Wheat. [17 U. S.] 423; Atkinson v. Savage [Atkinson v. Philadelphia & T. R. Co., Case No. 615.] In the affidavits we can perceive no ground of imputation of bad faith in the commissioners or their agents; they profess to have acted in the exercise of their discretion, according to their judgment, and not from partiality or design to oppress the complainants or improperly favor others. Under such a state of things, if we differed in judgment with the commissioners, as to the necessity of diverting this water course, and were even of opinion that one equally convenient could be found without going on the complainants' premises, it would be no ground for an interference. So long as it is a mere question of discretion, depending on the relative conveniences and facilities to effect the authorized objects, it is intrusted to a tribunal over whose honest and impartial judgment we have no appellate power. We can prevent the effects of perversion or abuse of discretionary power, but not of their legitimate, honest exercise; the latter belongs exclusively to tribunals of appellate jurisdiction.

These reasons would induce us to decline granting the injunction, on motion, if there were no others, but we cannot omit noticing another which has powerful if not conclusive influence on our minds. The acts complained of, were begun on the 19th May, of which the agent of the complainants had notice on the 22nd. On the 28th an attempt was made by him with the assistance of a peace officer and some others, to take possession of the land and expel the respondents and their workmen, but without success; the complainants notified them not to proceed with the work, but took no further means to prevent its progress or completion, till the filing of the bill on the 25th June; in the mean time the dam was built to the height of eight or ten feet, a trench dug across the land of the complainants, and the water of the stream conducted to a reservoir on the adjoining farm, whence it was conveyed through pipes to the engine house. As the nature of an injunction is to prevent the doing of an act threatened or about to be done, it is too late to apply for one after the act is consummated; the dam is erected, the trench is dug, and water flows through it; we cannot order the one to be prostrated or the other to be filled up; by acquiescing in the commission of these acts, after ample notice, the complainant has rested on his legal rights and looked to his legal remedies, having suffered the thing to be done, his preventive cannot apply, and he must look to

damages for his past injuries. Injunction is a remedy altogether prospective. It was in the complainants' power to have applied for one, either in court or to either of the judges, as soon as they had notice of the intended works. They had their election to apply for the preventive or wait for the compensatory remedy; as to acts committed before the filing of the bill they must look to the latter remedy, though it is not too late to apply for the prevention of any future injury which is in its nature an enjoinable one when impending or threatened. There is no allegation that any act of this kind is about to be done on the premises, unless it be the conducting the water from the dam through the trench in pipes to the reservoir. Taking this as the gravamen of the bill, we cannot perceive in it an irreparable injury to the complainants' property; it would redress one act complained of by filling up the trench over the pipes, leaving the surface of the ground unbroken, without in any way interfering with its use for tillage, or pasture, which would be much less injurious than an open ditch or trench. Whether the water sinks into the earth in the trench, or is conveyed to the reservoirs in pipes, matters but little to the complainants; its use is lost in either case; an injunction in using pipes would therefore be of no benefit to them in preventing the diversion of the water, while the dam and the trench remain, yet it might immediately suspend all operations at the inclined plane. Under such circumstances we cannot therefore consider the mere act of laying pipes to be such an injury as is the subject of an injunction, and the other act complained of having been done before the bill was filed, we think there has been such acquiescence, such reliance on the legal remedy, and such expenditures made on behalf of the state, as precludes the complainants from any present relief in equity. Had the application been made as soon as the work was commenced, the attention of the commissioners might have been directed to other sources of supply of water if they had been accessible, and thus have avoided the risk of a suspension of their operations; the conduct of the complainants may have led them to the belief that the only subject of controversy was damages for the injury sustained by the diversion of the water, and to the expenditure of money in the construction of the works. By standing by after notice of the commencement of the work, until near its completion, when all the substance of the injury had been committed, without calling for the interference of equity to arrest its progress, the complainants must now be content to abide by their legal remedy or be refused any equitable relief until a final hearing. 2 Dow, 536.

The complainants' counsel have considered the acts of the respondents to be illegal, because they have entered upon the premises without notice, or any offer to make terms

with the complainants in relation to damages, as is required by several acts in relation to the canals and railroads of the state. This question would arise on an action of trespass for the entry, but not on a bill for equity, circumstanced as the present. It might have been a good reason for our interference to suspend the work, till all the requisites of the law had been complied with, and the effect of the omission may be to make the respondents trespassers, although their authority would have been ample after notice and an attempt to procure a release or adjust the damage, but the neglect to do it can have no bearing on the present motion on account of the lapse of time and the submission to the acts done.

It is also contended that the acts of the respondents are without any authority in law, because no compensation has been made for the property thus appropriated to public use, and we know no mode provided by law for assessing damages in a case like the present one. If the complaint of this bill was the want of any provision for compensation, or of its actual payment before taking actual possession of the premises, or applying the water to public use, and the prayer had been to order a suspension of all proceeding till it had been done, there might have been strong grounds for our interference; the obligation upon the state to make compensation is undoubtedly co-extensive with their power to take or apply private property to public use. As this obligation is a constitutional one, it is not impaired by the omission to provide for it by the law which authorizes the entry or seizure; it can be enforced by action for damages in courts of law and injunction in those of equity. We are far from saying that a law is void which gives the authority without directing compensation to be made in some way, or that the legislature may prescribe the mode in which it shall be done without a trial by jury, inquisition or writ ad quod damnum, nor that a party is not entitled to all his common law remedies if the law is silent on the subject. Whatever may be the decision of a court of law on the constitutional right of an owner of property thus taken on any question of damages, depending upon the strict principles of law, which would be imperative on the court:—a court of equity acting according to sound discretion on the principles of equum et bonum would not interfere, if a just compensation was offered, or the state was willing to make some equitable adjustment of the damages. This question is not, however, now before us. The right to take the property in question under any circumstances is denied on the ground of there being no law which authorizes it to be done for the purposes to which it is applied, even if compensation was provided, for the complainants do not offer to cede or relinquish their right on receiving compensation. The object of the bill is not money, but to retain the same full property

and dominion over the lands as they have heretofore enjoyed before the entry upon it by the respondents. If they ask and receive compensation, their right to the water passes forever to the state, as the use to which it is applied is to be permanent. Should we now enjoin the agents of the state till compensation is made, the injunction would be dissolved on its payment:—when the complainants are willing to admit the right to take and use the water, and tender the prayer for other and general relief, or by an amended or supplemental bill, shall ask for just compensation for injuries sustained, the matter will be fully and fairly before us to award or refuse the injunction, as the justice and equity of the case may require.

At present there is no ground in which we can feel justified in granting the injunction. The complainants must be left to their remedy on a final hearing in an action at law.