THE HIBERNIA UNDERGROUND RAILROAD COMPANY v. JULIA DE CAMP ET AL.

1. A corporation formed under the supplement of the general railroad act, approved March 12th, 1879 (*Pamph. L.*, p. 166,) acquires, on condemning a right of way for an underground railroad, not the fee simple of lands, but an easement only.
2. Such a corporation cannot condemn the mere privilege of maintaining a railroad only until the land-owner shall choose to make an inconsistent use of the site of the road-bed.
3. Such a corporation cannot, by eminent domain, compel an owner of the fee simple of land to yield to it a right to construct and operate a railroad on the happening of a future, contingent event.
4. The rights which such a corporation is authorized to acquire by condemnation are present rights, and whatever may be necessary to make present rights perpetual.

In error.   For opinion of Supreme Court see *ante* p. 43.

For the plaintiff in error, *Henry C. Pitney*, (with whom was *Mahlon Pitney*.)

The principal questions involved in this record are two :

*First.* Is the Underground Railroad supplement of 1879 to the General Railroad act constitutional ?

*Second.* If a railroad company organized under this supplement shall, in constructing its road, encounter a vein of valuable mineral, *e. g.*, gold, so situate as to form a natural support for the railroad structure, must the company pay for and make use of such mineral for such support, or is it at liberty to disclaim support from the mineral and provide artificial means for crossing the chasm which the mineral fills, and leave the soil-owner at liberty to remove it ?

The Supreme Court held the supplement to be constitutional, and, constrained by the rulings in certain English cases, held that the railroad company is compelled, by the terms of the statute, to appropriate and make use of the mineral as a support, and cannot disclaim and resort to artificial means to cross the chasm to result from its removal.

I submit that in this latter respect the court fell into error. The source of the error was the failure to adopt and follow the broad and elastic rules of construction of railroad charters universally adopted in this country.

The reasoning of the learned judge is based upon the notion that under the statute of this state the railroad company must acquire, and does acquire, the very land itself, and not a mere easement in it.

"The company shall take," says the learned judge, "that which the legislature empowers it to take, and in the state and condition prescribed by the legislature. * * The company cannot carve out such an interest in or incident of property authorized to be taken as will suit its convenience, and condemn that."

The rule sustained by the great weight of authority in this country is, that a railroad company acquires an easement and only an easement in the strip of land acquired for its right of way. A new easement of the same character as that taken by the public for ordinary highways, requiring a more exclusive

possession of the land than the ordinary highway, but without the least power to sell or dispose of so much as a spear of grass, a stick of wood or a ton of earth, gravel, stone or mineral, and which leaves the owner at liberty to remove all minerals not actually necessary for the support or construction of the road.

In support of this proposition I cite the following authorities :

*Mills on Eminent Domain,* §§ 49, 52, 54, 210 ; *Pierce on Railroads* 157–160 ; *Rorer on Railways* 325 ; *Taylor* v. *New York and Long Branch Railroad Co.,* 9 *Vroom* 28 ; *Proprietors, &c.,* v. *Railroad Co.,* 104 *Mass.* 1 ; *Blake* v. *Rich,* 34 *N. H.* 282 ; *Chapin* v. *Railroad Co.,* 39 *N. H.* 564 ; *Aldrich* v. *Drury,* 8 *R. I.* 554 ; 5 *Am. Rep.* 624 ; *Evans* v. *Haefner,* 29 *Mo.* 141 ; *Lyons* v. *Gormly,* 53 *Penna. St.* 263 ; *Quimby* v. *Vermont Railroad Co.,* 23 *Vt.* 387 ; *Henry* v. *Railroad Co.,* 2 *Clarke (Iowa)* 288 ; *Clark* v. *Worcester,* 125 *Mass.* 226, 230 ; *Jerome* v. *Ross,* 7 *Johns. Ch.* 315, 337 ; *Winter* v. *Peterson,* 4 *Zab.* 524 ; *Sixth Avenue Railroad Co.* v. *Kerr,* 72 *N. Y.* 330, 332 ; *Railroad Company* v. *Brownell,* 24 *N. Y.* 345, 349 ; *Heard* v. *City of Brooklyn,* 60 *N. Y.* 242.

Some of the earlier charters in this state authorized the acquisition of a fee in the lands taken, but a construction which so results has always been resisted by the courts. The courts have always shown a disposition to limit, rather than to enlarge, the power of condemnation, both as to the quantity of land affected and the extent of the interest acquired in it.

The subject was fully discussed in *Taylor* v. *Long Branch Railroad Co.,* 9 *Vroom* 28, and the reasoning adopted and the result there arrived at are in accord with the position above taken.

It was held under the charter of that company that the wood and timber growing on the strip of land taken for the right of way belonged to the land-owner, and did not pass to the railroad company by the condemnation proceedings in that case, except so much of it as might be useful to the company in the construction of its road.

It will be seen that the reasoning of the learned Chief Justice was not based upon the phraseology of the particular charter then before him, but upon the general policy of the law and course of decision in this country.

If we turn to the charter of the New York and Long Branch Railroad Company (*Pamph. L.* 1868, *p.* 852,) we find section 1 empowering the company to "purchase, hold and convey lands," &c., for the objects of its incorporation; section 6 authorizing and investing it "with all rights and powers necessary, &c., to survey, lay out and construct a railroad," &c., * * "provided the land taken for said railroad shall not exceed," &c., and further, after the route is determined and survey is filed, "to enter upon, take possession of, hold, have, use, occupy and excavate any lands," &c., "upon payment of damages," &c., and provided "that in case of an appeal from the decision of the commissioners to estimate or appraise the value of any land or material taken," &c.

Section 7 provides that in case of inability to agree with the owner for the purchase of land required, a "description of the land required shall be made," &c., and "commissioners appointed to examine and appraise the land," who shall, after oath made, "view and examine the land and make a just and equitable estimate or appraisement of the value of the same and assessment of the damages to be paid by the company for such land and damages." The report of the commissioners "shall at all times be considered as plenary evidence of the right of said company to have, hold, use, occupy, possess and enjoy the said land," &c.

This language is ample, standing alone, to warrant the conclusion that the company takes a fee, yet, construed in the light of the whole act and the scope and object in view, the court held that the company took no more than an easement.

If we compare this phraseology with that of the General Railroad act, we shall find them substantially identical, the difference (if any) being that the General Railroad act is more restrictive than the special charter.

The supplement of 1879 to the General Railroad act, under

which these proceedings are taken, is still more restrictive in its language and clearly limits the company to a bare easement. The company organized under its provisions is authorized (section 1) simply to locate, construct, maintain and operate a railroad, and (section 3) the "right of way" of any road organized under its provisions to be acquired by condemnation proceedings "shall not include the right to permanently use or occupy the surface of the earth immediately above such railroad and where the same is not broken, but shall be confined to a mere right to tunnel and excavate the earth for its tracks." And, by section 4, it is provided that if a road is already constructed underground, without acquiring the right to maintain the same from the owners of the fee, such condemnation proceedings may be taken to acquire such right as it would have the right to take if the road had not been built.

Now it is claimed that this supplement must be construed in connection with the original act. Admitting this, it is a well-settled principle that the language providing for condemnation must also be construed in connection with the use and purpose for which the land is taken and its universality controlled accordingly. It is on that principle that language which, in one connection, would be held sufficient to authorize the acquisition of a fee, has been so construed as to limit the estate taken to that of an easement.

And so here, the force and effect of the condemnation clauses in the original General Railroad act must be construed in the light of these special clauses contained in the supplement of 1879.

Mr. Pierce, in his work on Railroads, page 157, says: "Whether the legislative intent is to take the fee or only an easement, depends rather upon the general tenor and purposes of the statute than upon the use or omission of technical terms. The taking of the entire interest in property may be authorized without using the words 'fee simple;' and even the use of these or equivalent terms may grant only a qualified ownership, a base and determinable fee, limited to the purposes

of the grant, and expiring when the property ceases to be used for those purposes. The taking of a greater interest than is necessary to satisfy the language and object of the statute is not to be presumed."

In *Lyons* v. *Gormley, supra,* the Supreme Court of Pennsylvania, in construing a Lateral Railroad act in its application to an underground railroad—making a case much like that before the court—held that the coal actually displaced in excavating the tunnel belonged to the owner of the soil and not to the railroad company.

Strong, J., says (53 *Penna. St.* 263): "Our opinion is, that the Lateral Railway act of May 5th, 1832, was intended to give the petitioner nothing more than a privilege to open, construct, complete and use a railway through the lands of another. The owner of the land is not divested of his right to the freehold, nor of his title to the stone, wood or minerals. The act fastens upon his land a servitude; but it does not disturb any right or ownership not essential to that servitude. Under the General Railroad law, and in most of our railroad charters, provision is made only for the acquisition of a right of way, as also 'in the acts of assembly respecting ordinary highways. The proprietor of the land retains his exclusive right to all its mines, quarries, springs of water, timber and earth for every purpose not incompatible with the right of way. This is the almost universal rule, where a sovereign imposes a public highway upon the land of an individual. *Jackson* v. *Hathaway,* 15 *Johns.* 447; *Sanderson* v. *Haverstick,* 8 *Barr* 294."

In *Evans* v. *Haefner, supra,* the Supreme Court of Missouri held that where an ordinary railroad cut into a vein of mineral, such of it, and no more, as was necessarily displaced by such cutting, became the property of the company. All beneath the surface and remaining undisturbed, remaining still the property of the owner of the land.

The result of all the cases in this country is to hold that a railroad company acquires the same sort of a right in the soil as the public do in a highway, viz., an easement in or

right of way over the same. This easement is necessarily, from the circumstances, more exclusive than that of a mere highway for ordinary vehicles, particularly at the terminal points and stopping places, where the company is not only a carrier, but a warehouseman and innkeeper. *Pierce on Railroads* 159.

The courts also, in obedience to a well-defined policy, limit the extent of the interest acquired to the actual needs of the company. The easement shall be no more exclusive, and the land subjected to the easement shall be no greater in extent, depth, width and length, than is needed to carry out the enterprise of the company.

In *Clark* v. *Worcester*, 125 *Mass.* 230, the court says : "The right to take is limited by the public exigency stated ; beyond that, the power to exercise the right of eminent domain is not given. The statute is to be strictly construed in this respect. The same terms are used which are employed in the statutes giving authority to take land to railroad and turnpike corporations, and the same rules of interpretation govern. * * The power to take land for the purpose stated does not confer the right to take an absolute estate in fee simple, because such an estate is not necessary to the enjoyment of the defined privilege any more than it would be necessary where land is taken for a highway, railroad or turnpike. The use only of the petitioner's land was taken, and that use is limited to the purposes named. The rule is applicable, which defines the rights of the owner of an easement in the land of another, by determining what is reasonably necessary for the enjoyment of that easement. For all purposes consistent with that enjoyment, the right to use the land remains in the owner of the fee."

In every direction the reasonable necessity of the company is the measure of its capacity to acquire.

If, then, under our system and policy, the company is prohibited in every case from taking more than it actually reasonably needs, why should it in any case be compelled to take and pay for more than it needs ?

Apply the rule laid down in *Taylor* v. *Railroad Co.*, 9 *Vroom* 29, viz., that so much of the standing timber on the strip of land as may be useful to the company in constructing the line of its road may be taken. What sense or justice is there in compelling the commissioners to speculate upon how much of the timber will so be useful and compel the railroad company to take it? Why not permit the company at once to say, None of it is wanted; we disclaim all desire or intention to take any of it?

This is, in practice, what is actually done.

The legislature has itself fixed the limits of the width of the strip to be taken in ordinary cases at no more than one hundred feet, and the quantity for station purposes at no more than ten acres, and yet it has never been held that a company is compelled to take all of that width for a right of way or all of that quantity for its station.

Where the company says, We do not need to use this or that thing, why should the owner be permitted to contend to the contrary and force upon the company what they say they do not need?

Suppose a railroad line laid across an open stone quarry worked out to a depth of fifty or one hundred feet below the grade of the road. Must the company fill up the gorge and ruin and pay for the quarry, or would it be competent for it to cross it by a bridge and leave the quarry-owner free to continue his enterprise? Why compel the company to do so injurious and expensive a thing merely because the quarry lies directly beneath the line of its road?

Take a case more nearly like that in hand. Suppose a railroad projected across a tract of land upon which, shortly before taking proceedings to condemn, is discovered a valuable vein of mineral—say gold—crossing the proposed line and so near the surface as to reach the bed of the proposed road in a cut. What sense or justice would there be in permitting a land-owner to say to the railroad company, You shall not bridge this vein of ore but shall pay me the value of it as a support for your road upon such a speculative valuation as

commissioners shall adopt, and then, when you shall have paid for it, you will not have the right to mine and sell one pound of it?

Or put the converse of that case. Suppose a railroad laid out across a tract of wild, rough land of little value, with no suspicion of minerals in or under it, and damages paid on condemnation proceedings based upon such notions of its value; and suppose, in making a cut across this land, the railroad company should uncover a valuable vein of gold-bearing ore crossing its line. What sense or justice would there be in justifying the railroad company in refusing the landowner the privilege of providing a bridge for the railroad across the vein, and then taking out the minerals?

And what could be said of a system of jurisprudence which would sanction either of the two cases last above put? Surely it would be the height of injustice in the one case for the railroad company to withhold from the land-owner the privilege of constructing and maintaining a bridge for its use in order to enable him to remove the minerals. And, in like manner, it would be equally unjust for the land-owner to refuse to permit the railroad company to disclaim the use of the minerals as its support.

Both cases are governed by the same rule. On the one hand, you shall not keep what you neither need nor have paid for, and, on the other hand, you shall not be compelled to use and pay for what you do not need and can dispense with.

This question was indirectly answered in favor of my present contention by Chancellor Kent in the very last opinion ever read by him (*Jerome* v. *Ross*, 7 *Johns. Ch.* 315, cited in *Mills on Eminent Domain*, § 49,) as maintaining this proposition—"The public cannot be compelled to take a fee when a temporary use or easement would suffice."

The part of Chancellor Kent's opinion relied upon commences at page 337, and holds that the commissioners of the State of New York, vested with the power to build a canal for the state, might take stone out of a quarry for the purpose of the construction of the canal, without acquiring the

fee to the quarry, although the act did not, in terms, provide for taking anything less than a fee.

And the Court of Appeals of New York, in *Sixth Avenue Railroad* v. *Kerr,* 72 *N. Y.* 330, 332, answered the question directly and expressly in the following language:

" It is also in accord with the reported decisions of our own courts, which clearly recognize this power in the legislature, as well as that other rule which is contested by the learned counsel for the appellant, that the state, in the exercise of the right of eminent domain, or a corporation having the delegated power, is not bound to take the entire estate, but may take, and strictly should take, only such an interest and right as is necessary to be acquired to accomplish the public purpose in view. An easement merely, or a partial interest, or the right to a temporary or permanent use of property, as well as the entire estate and interest, may thus be acquired as the public service may demand, and so long as the owner is compensated for the damages sustained he has no cause of complaint, but he might, if more property or a larger estate or interest was taken than was required for public use, contend that his rights of property have been legally invaded."

But, it is said, these statutes authorizing the exercise of the power of eminent domain, always have been and must be construed strictly. That the statute in hand does not authorize the company " to carve out such an interest in or incident of property authorized to be taken as will suit its convenience," &c. The statute " authorizes the condemnation of lands. The application for the appointment of commissioners is to describe lands. The commissioners are to examine and appraise lands."

In answer, I have shown, I think conclusively, that, notwithstanding the phraseology quoted, all that the company gets is a pure easement of support, leaving the title still in the owner, and this easement of support is precisely what we are asking to condemn. What we say is, that we do not wish to support our structure upon this valuable vein of ore and thereby deprive the owner of the privilege of removing it, but

we desire to resort, in place thereof, to support by timbers upon the valueless rock on either side. In short, we wish to support our structure on a bridge.

Where, I ask with some confidence, is there anything in the act which indicates that the legislative will is adverse to this course?

We are asking only for support for our ties and rails by timbering or other means upon the adjoining rock. This is an easement, and the very easement which the act authorizes us to take. It is in no sense a new or extraordinary " interest in or incident of the land " not contemplated by the statute. In effect it is the very support which the statute contemplates. It is, in effect, saying we will bridge this pillar of ore, so that it may be removed and the already existing chasm extended from below to the level of the track. It is, in effect, shifting the weight of the structure from the pillar of ore on to the adjoining property. In so doing we are still taking " land " in the sense in which that word is used in the statute, construed—original act and supplement—as a whole.

Suppose this case? An ordinary surface railroad laid out across the outcrop of a virgin vein of ore—one from which no ore had ever been removed—and the right of way acquired by ordinary condemnation proceedings. The land would be taken, but the title to the ore would still remain in the landowner with the right of removal, by subterraneous mining, so much of the ore as would leave sufficent support for the railroad. And the question before the commissioners, whose duty it is to appraise the damages, would be, How near the surface could the ore be safely worked—or, in other words—how much ore would the owner be obliged to leave, and so lose, for the support of the road? Now, suppose the railroad company should show the commissioners that their plan of construction was such that the land-owner could remove all the ore; that the outcrop was at or near the bottom of a gorge or ravine, through which water ran after a rain, and which it was not only necessary but much cheaper for the company to cross by a bridge of such span as to leave the ore free to be mined.

Ought not the commissioners to take that circumstance into consideration?

But, again, it may be said, and is said, You have no statutory authority to do this—to build a bridge or such a work as you describe in your application.

Let us see. There are thousands of such structures in existence in this state at this moment, sustaining railroad tracks over roads, dry ravines, gullies and depressions in the earth, erected for the purpose of diminishing the damages which the structure would inflict upon the adjoining property by stopping the flow of mere surface water and obstructing drainage.

The only direct authority for these structures, and the consequent shifting of the weight of the railroad, is found in the general language found in most of the old special charters and incorporated in the General Act, p. 928, § 11. " For that purpose to enter upon and to erect embankments, bridges and all other necessary works, and to do all other things which may be suitable or necessary for the completion," &c.   1 *Shelf. Railw.* *429.

Now, it is well settled that the word " necessary " in that connection is not used in its absolute sense. It does not mean indispensable, but useful, needful, requisite, incidental.

2 *Bouv. Law Dict.* 186 ;  2 *Story on Const.* 1248, 1249 ;  7 *Johns. Ch.* 339, 340, where Chancellor Kent uses the following words :

" The word ' necessary ' does not mean absolute and indispensable, or that without the use of the land in the given case the work could not possibly go on.   That would be the same as extreme necessity.   The legislature used the word in the more reasonable and popular sense.   It is sufficient that the land used, and the materials taken from it, are needful and conducive to the object, and more convenient in the application and less valuable, and the use of them less injurious to the owner than any that might be readily selected."

The right of eminent domain exercised to acquire the right of way for a railroad is said to rest upon the public " necessi-

ties." *Cooley's Const. Lim.* 524, 525, and cases cited. And yet the cases are few indeed where any absolute necessity for its use exists. The real foundation is the promotion of the public convenience and welfare by the saving of time, labor and expense in transporting men and things from one point to another.

This court, in *Railroad Co.* v. *Righter*, 13 *Vroom* 184, spoke of "the managers of a railroad" being "compelled to use fire and powerful engines and swift trains," and said that "inasmuch as the exigencies of modern life have compelled the legalizing of these means of commerce." It is plain that the words "exigencies" and "compelled" were not there used in their absolute sense, but to convey the idea of what we mean when we speak of the "necessities" of modern civilization.

The real merit of the improved means and mode of transportation of modern days is their ability to save time, labor and expense, and whatever reduces their first cost saves in the item of interest, and so enables them to serve the public at a better advantage. Hence, whatever tends to reduce the first cost of the public work, conduces to the public good, and, in the sense in which that word is used in the statute, is "necessary."

The statute has not pointed out in what places and under what particular circumstances "bridges" shall be built, nor designated their size or material or design. It has not even required in express terms that all running streams should be spanned by bridges, nor has it forbidden their use where there is no running stream, so that they can be used and are in common use for carrying the railroad structure over any object which it may conduce to the interest of the corporation to avoid disturbing or covering, be it a river, running stream, conduit for surface-water, public highway, or private roadway.

If the company may resort to a bridge to enable it to avoid doing injury to the land-owner by occupying the bed of either a continuous running stream or a surface-water sluice, why should it not also be permitted to use a bridge to avoid doing

the injury consequent upon occupying a valuable vein of mineral ?

I contend that even upon the strict construction of the act, the language above quoted, " to erect bridges and all other necessary works, and to do all other things which may be useful or necessary for the completion, repair or management of said railroad," &c., is ample to authorize us to adopt and construct the timbering and bridging here proposed to be used to avoid resting our structure on the vein of ore.

*Watson* v. *Acquackanonck Water Company*, 7 *Vroom* 195, was cited as an instance of strict construction of these statutes. But the examination of that case shows that the controlling circumstance there was that the act carefully discriminated between lands required for the location of the works of the company and the right to divert water, and that the right to condemn was given in the one case, and only the right to acquire by purchase in the other case.

I venture to suggest that in the absence of the discrimination above referred to appearing clearly on the face of the statute, the cause of justice would not have seriously suffered if the case had been decided the other way.

The conclusion may be thus stated :

The railroad company in taking land acquires only an easement therein of support, with incidental use and occupation, which easement varies with the circumstances in the degree of its exclusiveness and destructiveness of the beneficial ownership by the holder of the fee, and the company has the privilege, by the use of the structures and contrivances mentioned and provided for in the statute, to diminish, as far as practicable, the exclusive and destructive character of its easement, and the resulting injury to the holder of the fee, for the purpose of reducing the damages to be paid, and, further, in the case in hand the supplement of 1879 confines us to a bare easement of a tunnel.

For the defendants in error, *Cortlandt Parker*, (with whom was *Alfred Mills*.)

I. The act of 1879 is unconstitutional. It is for no public use.

1. The use is for freighting only. It is not for transporting passengers as well as freight.

2. This freighting is not general. It is for the freighting of minerals, and of material, implements and machinery used or to be used in the sinking or working of mines.

3. The act is for the purpose of "purchasing, operating and maintaining any railroad already located and constructed for such purpose."

None of these uses are public. What does the constitution mean by this word? Section 16, page 15: "Private property shall not be taken for public use without just compensation; but land may be taken for public highways as heretofore, until the legislature shall direct compensation to be made."

"Private" and "public" are antagonistic words. Highways illustrate what the constitution meant by "public."

The road in question was built by a private corporation for its private and exclusive use.

Was a public use or purpose established when a corporation was authorized to be organized in order that it might purchase, operate and maintain what another corporation then had built, and then operated and maintained for its private ends?

It is said that the second section of this act, by fixing and authorizing rates of freight, shows that it was for a public purpose—that of general transportation—that the incorporations were created. One sufficient answer to this is that the language of the act is, "It shall be lawful for any corporation or private person owning or operating such a railroad, to charge," &c.

The power intended could be no public power if conferred, by especial mention, upon a private person.

It is urged that because this is a supplement to the General Railroad law, and because of the general language closing section 1, that the corporations to buy private railroads are to be held public, and their object public use.

But this supplement, by its terms, limits the general use by the designation of things as the purpose of the corporation which are private and are not general in their nature.

This language was used for restriction. It was entirely unnecessary, except for this.

Suppose the act had authorized a company to locate, build and maintain a railroad beneath the surface of the earth, with all the powers of corporations framed under the act to which this is a supplement, then certainly this power of freighting would be given, and that of purchase, too.

When the act defined the use, mentioning one less than the other, it excluded general use. It gave no power to convey or charge for passengers or for other freight than what is specified.

When a statute first expresses a restricted use, should not general words following be restrained to that use?

*Barracliffe* v. *Griscom, Coxe* 193, 195 ; *Livermore* v. *Freeholders,* 5 *Dutcher* 245 ; 2 *Vroom* 507 ; *State* v. *Trenton,* 9 *Vroom* 64.

A deed vesting a fee to be used for a special purpose, imposes the necessity of that use, or at least the forbidding of an inconsistent use, and the title reverts in case of it.

So, where the statute gives the corporation being, not for the general purposes which every railroad company can promote, but only to carry freight, and that of a special and particularized nature, how can the corporation, notwithstanding the general language used, have the rights which only belong to a public use?

The principles of public use are exhaustively considered in *Scudder* v. *Trenton Del. Br. Co., Saxt.* 695 ; *Coster* v. *Tidewater Co.,* 3 *C. E. Green* 518.

These cases decide that where the legislature declare a use

to be public, and clearly give the right of condemnation, the courts will be careful how they pronounce otherwise.

But the question here is, Does the legislature mean to establish public uses where the use is in its nature private and not general; I mean in the case especially of purchasing a private railroad?

A corporation, to purchase a right of way *ex vi termini*, can have no right to condemn.

· The legislature impliedly excludes such right when it makes the right of way a purchased one.

Hence, counsel are driven to build the right of condemnation on the fourth section: "Whenever it shall happen that any railroad in this state shall have been built upon, under or through any lands, without acquiring the right to maintain the same from the owner or owners of the fee simple of said lands or any part thereof, it shall be lawful for the corporation owning and operating said railroad, to take and prosecute all such legal proceedings to acquire the right to maintain and operate its said railroad that it would have the right to take and prosecute if such railroad had not as yet been built upon, under or through said lands."

Does this section give the right of condemnation in this particular case?

The railroad was built in 1876, maintained and operated, the right fully given. And the Glendon Iron Company, by deed, August 9th, 1879, conveyed "all that certain narrow-gauge underground railroad, with all and singular its rails, ties, switches, sidings, platforms and road-bed, situate, &c., with the right of way, to the U. R. R. Co., its successors and assigns forever."

This deed, it appears, was forgotten. But the treasurer of the state saw it and certified to it. It describes the route by courses and distances.

Evidently, the railroad company, under that deed, claimed a fee in the road-bed and rights of way through the whole course of the route.

Now, it would seem that these questions arise on this fourth section :

1. Is it applicable to a case where it had, before the act, happened that the railroad had been built without acquiring the right to maintain it from the owner in fee simple, or only to cases where, after the passage of the act, it shall happen?

2. Does it provide for a case where the right to maintain exists and comes from the owner in fee simple, or does it intend a case where the right to maintain is not, so to speak, a fee ?

3. Does the language authorizing legal proceedings, &c., mean proceedings for condemnation?

4. If it does, what right to condemn belongs to a corporation which has bought a railroad not yet built upon?

Taking these questions in order, it is submitted—

1. That the act is not to be construed retrospectively.

A leading case on this subject is *Coddington* v. *Beebe*, 5 *Dutcher* 556.

The words are not necessarily retrospective. In fact, they are in terms prospective. For either reason, they do not apply to the case in hand.

2. The language cannot be extended to authorize condemnation. The right to maintain the road has been acquired "from the owner in fee simple." If the act, as drawn, imperfectly expresses the legislative intent, that is nothing. If the railroad company has purchased an imperfect title, that is nothing.

The deeds of February, 1884, and the lease of the De Camps give full right to build and maintain. Their grantors comprise all the owners in fee simple.

Nor did the act mean what would have been expressed had it said "without acquiring the right to maintain the same in fee simple." First, this would have been incorrect language, technically speaking. "Fee simple" describes an estate—not a right to maintain a railroad. Second, the act was supplementary to one which never gives authority, but for terms of years. Why should it be thought to favor title in fee simple and allow that estate to be acquired by condemnation?

3. Does the language authorizing the taking legal proceedings mean proceedings for condemnation ?

The right of condemnation will never be presumed. It must be given by clear words, or at least necessary implication. If, in this case, the De Camps interfered with the maintenance, there are " legal proceedings " possible to protect their lessees —in chancery or at common law.

4. But the act describes the " legal proceedings." Such, namely, as it would have the right to take and prosecute if the road purchased " had not been built upon." What legal proceedings, these ? Certainly, not proceedings for condemnation.

The language had a probable intent, but it is not expressed.

Nor could the legislature have meant that lessees should be permitted to extinguish their. lessor's title. This would be directly authorizing the destruction of a contract. The policy of the law of landlord and tenant would be contravened by giving this act such a construction. The courts will strain to prevent it.

This fourth section, then, cannot help the defendants. Are they helped by the general act and the general words, in this ?

Not by the general words in this, for, as already shown, they are restrained by the particular restricted use imposed upon this railroad. Nor by the general act, for the use described there is not only different from that prescribed in this, but it is one which cannot, in the nature of things, exist in. such a railroad as that in question.

The general railroad law authorizes corporations for the purpose of constructing, maintaining and operating a railroad for the public use, in the conveyance of persons and property.

The twenty-sixth section commands trains for the transportation of passengers and property at regular times, to be fixed by public notice, shall furnish sufficient accommodations for the transportation of all passengers and freight, offering, &c.

Can this underground railroad comply with these requisitions ? Is there any similarity between the regular notified

carrying of passengers and property, and the use had or projected of this underground railroad? A railroad which runs into a hill, whose terminus at one end is an inaccessible mass of mineral or earth; at the other, an adit to the air and the light without a station, without possible use for passengers, without possible use for general freight—only for the benefit of the Glendon Iron Company, or, at very farthest, one other company mining in that dark cave?

There is no analogy in the "private way" cases. They only decide that a "private way," in New Jersey, is a public one; public in everything but compelling the public to maintain them.

Nor is there any analogy in the Pennsylvania cases as to lateral railroads. They, and the case of Henry v. Thomas, go too far for New Jersey. But in all these cases, there was possibility of general travel of persons, and general freightage. While here is none of either.

Try it by one question. Before this incorporation, was the railroad one whit less a public use than it is since? It was the same railroad, in the same spot, accommodating the same parties, and accommodating no more—yea, without the opportunity of accommodating more.

Does the fact of incorporation make that use public which, before, was not?

Shall it be held, in New Jersey, that A shall give up his land, compulsorily, to B and C, who wish, by its use, to make a way to theirs? When things are so situated, that, only that, use is practicable—that the public cannot enjoy it?

II. The condemnation proposed is without precedent and without authority in the statute.

Tracks of the railroad purchased lie upon land consisting of ore, but still land.

But it is not proposed to condemn this land, nor any easement in it, of support thereby of the tracks.

Neither is it proposed to give up this land—these ores—at once, only when the owners wish, and give reasonable notice.

If the owners do notify and proceed to remove ores support-

ing the road-bed, then the railroad company is to have the right to bridge across for a support, or by other means, or to excavate in the hanging-wall of the vein, to provide a road-bed, and thus make a new track.

So there is to be considered, first, a track without a road-bed or a support, either on the land as now existing, or by using the land for a support; and, second, a different alternative route is to be provided, so that the mining of the rejected land may, at the option of the owners, go on.

What says the petition? "These proceedings are not intended to acquire any right or easement of support for the tracks or road-bed of said railroad by the ores lying beneath said tracks and road-bed."

" In case the support of said road-bed shall happen to be destroyed or materially weakened by reason of the removal * * * of the ores lying beneath the same, then the company are to have the right to support said road-bed by timbering placed across said tunnel, or by other means, or to make an excavation in the southeast or hanging-wall of said vein for the purpose of providing a road-bed for said railroad," such excavation not to exceed eight feet in breadth and the height of eight feet.

Now, land or interest in land, such an interest as forms an easement, is the thing to be condemned.

This the petition says it will not have. What does it ask? The situation it would have, if the owner of the soil covenanted with them, first, that the rails might remain there till he wished the ores; second, that then he would give reasonable notice before taking it; third, that if taking the ore should destroy or imperil the support of the road-bed, then they might bridge the chasm, supporting timbers on each side, or attain such support by other means, or that they might remove the railroad from its present bed and take another in the hanging-wall.

These covenants, peformed, might accomplish the end in view. But would they create an interest in land—an ease-

ment; would there be the "taking" of anything if these covenants were made?

The railroad law never contemplated any such scheme as this. Its first section empowers the corporations (1) to cause survey, and for that purpose enter upon the lands or waters of any person; (2) to take and hold such volunteer grants of real estate and other property as shall be made to it, but only for the purpose of such grant; (3) to purchase, hold and use all such real estate or other property as may be necessary for the construction and maintenance of its said railroad. And condemnation requires the examination and appraisement of lands taken and of damages occasioned by the taking thereof.

But this petition says, We won't take the lands nor any easement in them. We leave the lands with the owners. We wish no privilege of support on or by them. We propose to be clear of any "damage by reason of taking." Notwithstanding, we wish to occupy this hole in the land; to use the land we will not take; and to have rights in case we wish them, to support our road by timbering or other means; or to take, then, if driven to it by the owners compelling us to cease use of the land under our route, as surveyed, other land and another route contiguous, or near.

It is submitted that under no construction of the railroad law can such a scheme as this be sustained. The owners cannot be freed to covenant as the corporation desires. Nor, in any event, can there be an alternative route.

Suppose an elevated railroad projected over a street, the fee in which lay in the contiguous owners, could the right be taken by condemnation of support through use of the lands adjoining on either side, between which the road should be swung, or could an alternative be proposed, that, if the owners wished, the route should change to taking the contiguous territory?

Clearly, the law says take the land on which to construct your road and its bed. This gives you, legally, not the land, but an easement on it and in it. And it says nothing more.

The scheme meditates an economy, but an illegal economy.

The corporation now has the land under the road-bed, and on which it is supported. It has this till the lease ends. Then it proposes to have it forever, if the owner does not dig it out, without paying for it, and if he does, then, that it shall get a different route, or timber—that is, bridge acoss the tunnel, using each side for support.

How is this privilege to be estimated by commissioners? Land, a thing taken, can be estimated. This is beyond the power of estimation—for nothing is " taken."

All that is done is, imposition upon the land-owner of a contract to extend the lease till the ground is desired, and then to substitute other land for a support.

If this is economy, it is illegal economy. The state either takes the land of the citizen or lets it alone. If it takes, it compensates for its value. It lays no plot by which it can have the use of the land, in fact, without compensation—can require that a use be permitted till it is wished for other uses, and then that a cheaper route be substituted for it.

It is said that this substitute route is within the one hundred feet permitted by law. True, but it is not within the eight feet projected by this petition as the route. Only four feet of the tunnel on each side the centre line are within the sought-for right of occupation.

This petition restricts the width of the route.

III. Technically, no right exists for the proposed condemnation.

1. Because there was no route filed by the corporation.

2. Because if the survey annexed to the certificate of organization is obedient to the law, it does not describe the route projected.

The act of the corporators before being incorporated can in nowise be the act of the corporation. This route is part of the certificate, wholly unnecessary, but permissible.

The certificate and its filing give being to the artificial person. After this being is created, then only can it act.

Section 11 of the Railroad law (*Rev.*, *p.* 927,) shows that it

is the corporation, after its creation, that is to file the route and proceed to take the lands.

An unnecessary filing is no filing. Suppose two corporations seeking the same route—would the informal filing, informal because precedent to incorporation or contemporaneous with it on the formal filing, give the right?

Clearly, the formal filing by the previously-formed corporation; and if so, then it is the filing requisite, though there be no rival seeking the route. *Morris and Essex Railroad Co.* v. *Blair*, 1 *Stockt.* 135.

IV. The corporation seeks to acquire " the right to perpetually maintain and operate the railroad as at present constructed," when its own existence is not perpetual, though for a long term.

If this be technical, it is none the less a legal objection. The right sought is through technicality. It is a right dependent upon strict statutory obedience.

V. The proceeding is a sheer fraud. The Glendon Iron Company, in another shape, seeks to abrogate its lease and enlarge its right to this property without buying it. The court cannot shut its eyes to the facts. This alleged general act was procured for the purpose of this Hibernia railroad. Having full right till the lease terminates, they desire to protect themselves in the enjoyment of other property, through this railroad, afterwards. They therefore get the act, become incorporate, and then seek a cheap acquisition of their object by this condemnation. They exclude rivalry on the part of the De Camps by fixing in the act such exorbitant tolls—twenty cents a ton by mile, and every fraction to be held a mile—as to shut them out from any use of the railroad.

The oppression of the scheme is too plain. The only remedy is to keep them within the law—refuse them the condemnation which they seek, or any condemnation which does not make them pay the value of the land upon which the railroad lies.

The opinion of the court was delivered by

Dixon, J.   This writ of error brings up a judgment of the Supreme Court setting aside an order appointing commissioners to appraise certain property which the Hibernia Underground Railroad Company seeks to condemn.

The company was organized under the General Railroad act and its supplements, for the purpose (as its articles of association state) of purchasing, operating and maintaining a certain railroad already constructed, running about two-thirds of a mile, wholly underground, through the Hibernia vein of iron ore in Morris county, to be used for the transportation of minerals, and of materials, implements and machinery for the sinking and working of mines. This railroad having been purchased, the company finds that the only right to maintain the same, on what is called the " De Camp mine lot," is derived from a lease which expires in 1894 ; and the proceedings now before us were instituted with the view of acquiring the right of perpetually maintaining the road across this lot, about ten chains in length.

The company's petition describes the property to be condemned (so far as the description is pertinent to the present inquiry) in the following language : " The right to perpetually maintain and operate the Hibernia Underground Railroad as at present constructed and operated, being a railroad with a single track of the gauge or breadth of two feet and nine. inches between the rails, and operated by steam locomotives and cars not exceeding six feet and six inches in breadth and eight feet in height, in, through and along that portion of the Hibernia tunnel * * * known as the 'De Camp mine lot.' * * * The centre line of said railroad, where it crosses said 'De Camp mine lot,' is described as follows : Beginning, &c. * * * Also the right to repair, renew and alter said railroad as occasion may require. Including the right, for the purposes aforesaid, to enter upon and occupy so much of said tunnel as lies within four feet of said centre line on each side thereof. * * * These proceedings are not intended to acquire any right or easement of support for

the tracks or road-bed of said railroad by the ores lying beneath said tracks and road-bed, but the present and future owners of said 'De Camp mine lot' are to be at liberty, after reasonable notice to said Hibernia Underground Railroad Company or their successors or assigns, to mine and remove all or any part of the ores lying beneath said road-bed, notwithstanding the removal thereof may weaken or destroy the support of said road-bed. And further, in case at any time the support of said road-bed shall happen to be destroyed or materially weakened by reason of the removal in whole or in part of the ores lying beneath the same, then and in such case the said Hibernia Underground Railroad Company and its successors and assigns, are to have the right to support said road-bed by timbering placed across said tunnel or by other means, or to make an excavation in the southeasterly or hanging-wall of said vein, for the purpose of providing a road-bed for said railroad ; such excavation not to exceed the breadth of eight feet, measured from the face of said hanging-wall, and the height of eight feet, and to extend along said hanging-wall across said lot of land at the same level as the present floor of said tunnel."

One question raised by the land-owners is whether the rights thus defined were such as the company could lawfully condemn, and the decision of this question against the company in the Supreme Court is the matter now complained of as error.

The specific authority which the company aims to put in force is conferred by a supplement to the General Railroad act, approved March 12th, 1879, (*Pamph. L., p.* 166,) under which the company was organized. This supplement enacts that "When any corporation formed under the provisions of this act shall take legal proceedings to acquire the right of way for its proposed railroad beneath the surface of the earth, such right of way shall not include the right to permanently use or occupy the surface of the earth immediately above such railroad and where the same is not broken, but shall be confined to a mere right to tunnel and excavate the earth for its

tracks ; " and if the company has purchased a railroad already constructed, but has not acquired the right to maintain the same from the owners of the fee simple of any lands upon, under or through which it is built, then " it shall be lawful for the corporation owning and operating said railroad to take and prosecute all such legal proceedings, to acquire the right to maintain and operate its said railroad, that it would have the right to take and prosecute if such railroad had not as yet been built." The supplement also declares that companies formed under it shall have all the powers, and may exercise all the franchises conferred upon, and which may be exercised by corporations formed under the original act ; but we do not think that these general expressions can enlarge the scope of the special authority granted by the supplement for the con- demnation of a right of way beneath the surface of the earth. In designating the rights which the company was to obtain under this special authority, the language used is so explicit as to prevent any inference gathered from general terms ; it not only indicates what shall not be acquired, but also expressly declares to what the acquisition shall be confined.

We deem it clear that corporations formed to construct or maintain underground railroads are not entitled to condemn the fee simple of lands for their right of way. What they can acquire is a right to tunnel and excavate the earth, a right to maintain and operate the railroad. We need not examine or cite the many cases which have held that terms much more indicative of a fee, when used in a grant of eminent domain, import only an easement. All the decisions agree in laying down these principles, that the corporation can take what the legislature has authorized it to condemn, and nothing more, that the authority must be expressly granted or necessarily implied in the express grant, and that it must be strictly pursued. Under these principles, the phraseology used in the statute cannot mean ownership of the land ; it must mean only a right to construct, operate and maintain a railroad upon, through and under the land of another.

The petition, therefore, is correct in asking the condemna-

tion, not of land, but of the right to maintain and operate the railroad. This right, however, when acquired, would be paramount, and the land-owner could lawfully do nothing which would impair it. He might make any use of his land consistent with the maintenance and operation of the railroad; as owner of the ores beneath the road-bed, he might remove them, but always subject to this, that he should not weaken the road or materially interfere with the convenience of its operation. This would be the legal consequence of the condemnation by the company of a right to permanently maintain and operate the railroad as constructed. The petition, however, seeks to avoid this consequence, and to reserve to the land-owner the absolute right of removing the ore at his pleasure, without regard to the structure resting upon it. In other words, instead of the permanent right to support the railroad in its present position, which the statute expressly authorizes the company to condemn, the company proposes to take only a temporary privilege of support, until the land-owner shall see fit to remove the ore. Thus we are brought to the question whether the express grant of power to condemn the permanent use implies an authority to condemn a temporary use. A somewhat similar question was answered affirmatively by Chancellor Kent in *Jerome* v. *Ross*, 7 *Johns. Ch.* 315. There the canal commissioners had express authority to enter upon, take possession of and use any lands, waters and streams necessary for the prosecution of the improvement, doing no unnecessary damage; and it was insisted that the power could be exercised only for the permanent appropriation of the whole fee; but the court held that the commissioners were not obliged to appropriate a greater interest than was requisite for the public object, and that they might take possession of and use land, temporarily, for the purpose of quarrying stone with which to build a dam required by the canal. This view seems to have been subsequently sanctioned by the Court of Errors in *Lyon* v. *Jerome*, 26 *Wend.* 485. On the other hand, in *Currier* v. *M. & C. R. R. Co.*, 11 *Ohio St.* 228, where, under an ordinary power to take land for

the construction and operation of a railroad, the company sought to condemn a right of way, already occupied by it, for three years, to be used while its permanent road was building, the court said: "The road contemplated by the charter is a permanent thing; the lands to be taken for it, it is evident, were designed to be taken permanently, once for all. No such thing as a temporary appropriation of land is, in the charter, expressly mentioned, nor does it anywhere seem to have entered the mind of the legislature. * * * We think that by no fair, and much less by any strict construction of the powers granted to this corporation, can the appropriation claimed be brought within them."

It is noticeable that the New York cases differ from the one before us in several respects. The right of temporary appropriation was there conceded, because, for the purpose in view, that only was necessary to carry out the legislative design. But here the legislative design, as gathered from the statute and the company's articles of association, will apparently not be satisfied by the maintenance of the railroad simply until the land-owner shall choose to remove the ore in the road-bed; and the petition itself, in recognition of this fact, seeks to substitute another road, when the existing site shall be destroyed, in order to accomplish fully the object of the incorporation. So that this ground, relied on by Chancellor Kent, for inferring a right to temporary occupation, is wanting in the present instance. In the case of the canal commissioners, also, the right required was reasonably definite, as to both duration and use—possession until stone could be quarried sufficient for the building of a certain dam; so that a fair appraisal of the right was practicable, especially in view of the fact that the appraisal could legally be postponed until the use was ended. But here compensation must be made before possession is taken, and the appraisers must, therefore, say in advance what a right of possession is fairly worth, when the possession can lawfully be forthwith terminated by him to whom the compensation has been paid. Such an appraisement would, in most cases, be a mere guess, and

rarely could result in the ascertainment of just compensation, which is a constitutional prerequisite to the condemnation of property by individuals and private corporations.

I cannot, therefore, rid my mind of grave doubts whether the legislature has authorized the taking of such a limited privilege in the present site of the railroad, as the petitioner demands, and because of these doubts must deny that the power has been granted.

But the petition does not stop at the existing road-bed. Conceiving that the needs of the company may outlast the willingness of the land-owner to leave the ore for the maintenance of the superstructure, it prays the condemnation of a further right, in the event of the removal of the ore, to support its tracks upon other property of the owner, and not this only, but a right to choose, in the event indicated, whether that support shall be secured by timbers resting on both walls of the vein, or by excavating the hanging-wall to a depth of eight feet from its face. Thus it aims to carve out a sort of future contingent right in each of two distinct parcels of land now held in fee simple, and to acquire the option of determining hereafter which of those rights it will eventually appropriate.

This is plainly going beyond any power conferred by the statute. That a contingent estate already existing may be condemned under the law, I see no sufficient reason to dispute, for such a power seems to be necessary to enable the company, when an estate of that nature is outstanding, to acquire what the statute says it may acquire—a right to permanently maintain an existing road ; but that is a very different thing from a power to create such a contingent interest in order to condemn it, to the end that the company may, in a possible event, construct a different road on other lands. Such a power is not expressed in the statute or necessarily implied by anything which is expressed, nor have we found any decision tending to uphold it under an ordinary grant of eminent domain. In our opinion, the language of the statute imports only the

acquisition of present rights, and of whatever may be necessary to make those rights perpetual.

For these reasons the judgment of the Supreme Court must be affirmed.

*For affirmance*—THE CHANCELLOR, · DIXON, KNAPP, REED, VAN SYCKEL, BROWN, CLEMENT, McGREGOR, PATERSON, WHITAKER. 10.

*For reversal*—None. ·